COMPUTING SCALE CO. v. STANDARD COMPUTING SCALE CO., Limited.

(Circuit Court of Appeals, Sixth Circuit. April 2, 1912.)

No. 2,192.

1. PATENTS (§ 328*)—VALIDITY—COMPUTING SCALE.

The Hotsapillar patent, No. 728,577, for a computing scale, is void because the device described and shown in the specification and drawings was incomplete and inoperative, and was only made operative by changes which required the exercise of invention and were patented by others.

2. PATENTS (§ 30*)—INVENTION—REDUCTION TO PRACTICE.

The grant of a patent is based on the disclosure of an invention, which disclosure is made by the filing of the application. The invention is not made until there has been a reduction to practice, either actual or constructive, and this question must be determined by the situation existing when the application is filed, and not when the patent is issued. If the application does not disclose an operative device or one which can be made operative by the use of the ordinary skill of the art, it cannot be aided by the subsequent inventions of others made before the date of issuance.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 34; Dec. Dig. § 30.*]

3. PATENTS (§ 112*)—INTERFERENCE, AWARD OR ADJUDICATION.

A Patent Office decision in interference proceedings does not in any event operate in subsequent litigation as an adjudication, unless it is an award of priority upon an issue of fact.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 162–165; Dec. Dig. § 112.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

Suit in equity by the Computing Scale Company against the Standard Computing Scale Company, Limited. Decree for defendant, and complainant appeals. Affirmed.

Suit on patent, No. 728,577, issued May 19, 1903, to the Computing Scale Company, as assignee of Jacob Hotsapillar, upon his application filed April 14, 1892. The case came on for final hearing before the Circuit Court, upon complainant's evidence, comprising only the patent, the defendant's structure, and the record of a Patent Office interference. The defendant had taken no evidence, but had produced, at the hearing, models to show the inoperativeness of the patent. The Circuit Court made the usual decree for complainant. On appeal this court did not consider the merits, but remanded, with leave to both parties to take further proofs. 145 Fed. 627, 76 C. C. A. 384. The defendant then took the testimony of witnesses, in connection with models and drawings, with the purpose of demonstrating its theory that the patent was void for lack of utility. Complainant cross-examined these witnesses, but took no expert or other oral testimony contradicting defendant's theory. The Circuit Court sustained this theory, and dismissed the bill. Complainant now appeals.

[1] A computing scale comprises essentially, in addition to the general supporting frame, a platform to receive the article sold, a so-called value beam balanced upon the frame and containing price or other value gradations, and means for suspending the platform from the value beam. There is also a weighing or tare beam, adapted to indicate weight in the usual manner. The value beam is provided with a sliding counterweight or "poise," which, when it is adjusted so as to balance the suspended platform weight, will rest upon and indicate the price or value. Obviously the effect of this balancing poise will be modified by the distance between the fulcrum point of the balance beam and the point thereon from which the weighing platform is suspended; and a system of adjustment has been worked out by which the suspension point may be varied according to a scale of unit values marked on the value beam, with the result that the poise, when balanced, will indicate the total price at the selected unit value. For example, the balance beam or a parallel attachment may be marked to indicate the price per pound, varying from 5 cents at the point nearest the balance beam fulcrum, to 50 cents at the point furthest removed. Then, if an article weighing 5 pounds is suspended from the point marked 10, the balancing poise will indicate 50 cents as the total price at 10 cents per pound, while, if the same weight is suspended from the point marked 40, the poise, in order to balance, will have to be moved to the point where it indicates $2 as the total price. Prior to Hotsapillar's application, these general ideas were well understood and had been embodied in a considerable variety of efficient and successful computing scales. The lateral adjustment of the weight-carrying suspension point with reference to the balance beam fulcrum point had been accomplished in two distinct methods: First, by moving the weight-carrying platform and the suspending means laterally to and fro; and, second, by moving laterally in the main frame, the balance beam together with its fulcrum support. Each of these methods involved some difficulties of mechanics or of convenience. Hotsapillar conceived a third method, distinct from either of the others, and which, for the purpose of this opinion, we assume to have been entirely novel. His idea was to keep the platform and the balance beam both in permanent, fixed, lateral position, but to vary the suspension point by a sliding means forming a part of the connecting mechanism between balance beam and platform. The connection in former use had been in practical effect a straight rod, hanging free, and therefore vertically, from the suspension point, and at its lower end pivoted to the lever of the platform. Hotsapillar's idea was to substitute a T-shaped connector, pivoted at its lower end in the usual method to the platform lever, and forming by its upper, lateral extensions a guide along which would slide a block or loop connecting it with the value beam at any desired point. His general method of

construction is shown in Fig. 1 of his drawing herewith reproduced, in which 12 is the vertical connecting rod, having the slotted T head 40, 44, and suspended from the slotted value beam 49, 51, by the sliding block and hook 58, 56, 57.

It is defendant's theory that a device constructed in accordance with Hotsapillar's specifications and drawings has no utility, and this seems to be intended as the equivalent of saying that it would not be operative. Defendant is manufacturing under patents, one of which was granted to Francis C. Osborn, No. 793,606, upon an application filed January 26, 1899. This Osborn application was put into interference with the Hotsapillar application, upon issues in the language of the Hotsapillar claims as finally granted, and these issues were in due course determined in Hotsapillar's favor.

The first structure put upon the market appearing to involve this Hotsapillar conception was that of the defendant, built according to Osborn's pending application. Plaintiff's market structure first embodying this same con-

ception appeared later, and embodied also what are called modifications or improvements of Hotsapillar's conception, made by Koehne, as shown by patent No. 790,794, issued May 23, 1905, upon application filed September 9, 1896, and Austin, as shown by patent No. 804,915, issued November 21, 1905, upon application filed March 19, 1897. Both the Koehne and Austin inventions belonged to complainant when it put this scale on the market.

Border Bowman (Staley & Bowman, on the brief), for appellant. Edward N. Pagelsen, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). The question which defendant pleaded as one of utility and argues as one of operativeness seems also to be one of reduction to practice. It is clear on this record that the only structure ever built by Hotsapillar himself was a model which did not give to one skilled in the art any instructions or suggestions beyond those contained in the specification and drawings. The question is, therefore, of that constructive reduction to practice by filing of the specification and drawings which the established rule makes the equivalent of the actual building of a machine; and the first question we meet is as to the true time of such constructive reduction. After the filing of his application in 1892, it was prosecuted through various rejections and amendments. In June, 1894, he filed a substitute specification and new drawings. These were accompanied by a new oath, and were accepted by the Patent Office. So far as the issues in this case are concerned, it makes no difference whether these substitute specifications and drawings are considered as a part of the original application or as a new application. We are therefore required to consider these 1894 drawings in determining whether Hotsapillar had made a complete invention.

The primary question is: To what extent must a device, built as shown in the drawings and specifications, be operative in order to support a conclusion that the conceived invention has been completely made? This question was quite fully considered by this court in an opinion by Judge (now Mr. Justice) Lurton in Standard Cartridge Company v. Peters' Cartridge Company, 77 Fed. 630, 23 C. C. A. 367. He quotes from Loom Co. v. Higgins, 105 U. S. 586, 26 L. Ed. 1177, the illustration of an invention in some appurtenance of the steam engine which may be completely shown without describing other parts of the engine. He lays down the rules, also, as fully as contended for by the patentee here, that a completed invention is not negatived because the drawings are rude or imperfect, or because they are incomprehensible to one unacquainted with that class of machinery, or because they do not in all respects show the relation of the novel features to the old device nor describe precisely the mode of attachment nor with scientific exactness show other details of the combination. He concludes that the controlling question is whether "the absent features are such as would be readily supplied by a mechanic familiar with the subject and without requiring further invention" (77 Fed. 647, 23 C. C. A. 383); and whether the mechan-

ical questions left unsolved by the drawings were of such dignity as to require invention to carry into effect the idea indicated by the drawings (77 Fed. 652, 23 C. C. A. 388); and whether "that which remained imperfect in the sketches was remediable by the exercise of the technical knowledge of mechanics familiar with the construction and operation of the old machines" (77 Fed. 655, 23 C. C. A. 391). It is true Judge Lurton was considering a question really of conception, but he was adopting and applying the rule appropriate to questions of completion or reduction to practice.

We must then examine the nature of the alleged defects in Hotsapillar's machine, and, from their inherent character and from testimony relating thereto, determine whether they are inconsistent with a completed invention. The operation of the scale is effected by the energy inchoate in the suspended article to be weighed and exercised through the force of gravity, which will normally bring the article into the same vertical plane as the point of suspension; and this principle operates freely in the old fashioned steelyards, or in any simple balance scales. In ordinary platform scales, it operates through pivoting the free end of the platform lever to the bottom of the suspending rod, and by permitting the rod to hang vertically from its suspension point. In every computing scale before Hotsapillar this principle had been preserved without impairment; and, under that situation, the only thing necessary in connecting the platform lever and the bottom of the vertical rod was to avoid friction. The specific form of the connection—whether by a short pivot or long hinge or mere hook and eye—was immaterial, except for the question of friction, and expedients for minimizing friction in this connection were common and well known. It follows that, although in the claim of a patent for an improvement in the value beam of a scale of this type, it would have been necessary to include, expressly or by implication, and in order to make an operative combination, the platform lever and the vertical rod and the connection between them, it would not have been necessary to show or describe anything more than a conventional connection, and such a claim would have covered any form of connection that might thereafter have been devised and used in the entire combination. This being the situation surrounding Hotsapillar and any invention he might make pertaining to the upper part of the device, we find that, by using his T-shaped connector, and sliding along its upper edge the link which suspends it from the value beam, he contemplated that his point of suspension should be removed outside of the vertical plane of the lower end of the suspending rod. The extent of such removal would vary from nothing, when the link was at the center of the T connection, to (for example) six inches, when the link was at either end of the upper bar of the connector. It is apparent that, in case of such suspension from either end of this bar, the lower platform carrying end of the T connector and the suspension point at one end of its upper arm will tend to swing into the same vertical plane. This tendency must be resisted, in order to maintain parallelism between the upper horizontal bar of the T connector and the value beam when in balanced position; and in

Hotsapillar's illustrated construction this tendency will be resisted, and the resistance will take the form of friction at all of the points of attachment to the general frame. There will be a side stress at the platform and a reverse or counteracting side stress at the value beam. The mechanical principle here involved can be illustrated by supposing that a five-pound weight is swinging freely by a cord from a fixed suspension point. It will come to rest directly below the suspension point, and will exert thereon, through gravity, its entire potential energy, viz., five pounds. If we now take a bar and push this weight to the left so that the cord takes an angle of thirty degrees from the vertical, it will require a constant exertion of force to maintain the weight in this position. In other words, the weight will be continually expending a portion of its potential energy, say one pound, in resisting this side stress, and, as its total energy cannot increase, it will have remaining only four pounds to manifest by downward pull at the point of suspension. It follows that the presence of these side strains, unbalanced or uncompensated, is inconsistent with the essential idea of a scale, viz., that it should accurately indicate the varying weights or values of the different articles placed upon the platform; and in Hotsapillar's device the same article would indicate one weight, if the link was at the center of the connector, and it would indicate another weight, if the link was at one extremity of the horizontal arm; and there would be the same contradiction when the weight was translated into terms of value. Stated in another way, Hotsapillar approached a combination consisting of five elements, and undertook to improve element No. 1. If he had accomplished this by a mere change in the form or attachment of element No. 1, his patent might have described and illustrated and claimed only this improved form of element No. 1, in combination with the other four well-known existing elements. However, he did not confine himself to this mere improvement. He made such a modification that he upset the law of the combination. Having modified one element so that it would not work in the pre-existing environment, he must modify the other elements so far as necessary to meet the new situation, and, until he had done so, he had made no invention, no matter how meritorious the idea which he had conceived.

Having seen that Hotsapillar's change at the upper end of the connecting rod introduced a new condition for the remainder of the combination and modified its operation, the next question is whether this modification was great enough to require the total rejection of the result, or whether it was so inconsiderable that it can be disregarded. Upon this subject, we may be informed by the testimony. Defendants constructed a scale after the 1894 drawings of Hotsapillar, retaining this inherent defect (and two others hereafter mentioned), but otherwise removing every imperfection indicated by the drawings and minimizing friction at every contact point in the best method of the scale-maker's art. Complainant does not, by testimony or by argument, criticize this model in any particular. Its defective operation is manifested in two ways. When the suspension point is at one extreme of the connecting arm, the scale is "logy." The value beam, when it should be in its true balance, may be put into its up-

per tilted position and will stay there during a considerable lateral movement of the poise, or it may be put into its lower tilted position, and will stay there until after a correspondingly long continued movement of the poise. When the suspension point is at the other end of the horizontal connector rod arm, the value beam sticks at its central and apparently balanced position, in spite of moving the poise back and forth upon it. The net result is that the device will weigh correctly when using the price unit above the center of the connector, that this accuracy at once changes into inaccuracy as the suspending link is moved in either direction, and that the inaccuracy increases with the lateral progress of the suspending link and with the increase of weight upon the platform, until, with a heavy article, at the extreme high or at the extreme low price, it will reach 10 per cent. Obviously such an error cannot be compensated by any system of markings on the value beam, and it is equally obvious that such device is not entitled to be called a computing scale. The testimony is undisputed that such a scale would not be permitted to be used under the common, public regulation of weights and measures. Hotsapillar undertook to invent an improvement in computing scales, and, unless what he produced could be applied to a scale so that the scale would compute, he had not accomplished his object.

Having found that the device, in the form shown, and constructed with the greatest skill compatible with that form, was inoperative, and that it was inoperative to a substantial degree, we come to the question whether the inherent defect could have been obviated or compensated or neutralized by the exercise of their expert knowledge by those skilled in the art, or whether such correction required the exercise of further invention before the originally planned and unitary invention was complete. This record indicates only one method known, even yet, for using the laterally adjustable suspending link at the upper end of the connector and avoiding the objectionable side strains. This consists in extending the foot of the connecting bar in a plane parallel with the upper horizontal arm and pivoting the platform lever thereto at two widely separated points. The record indicates that this plan was first adopted by Koehne in his application filed in 1896 (or perhaps by Culmer, by patent No. 552,278, issued December 31, 1895), and it has been employed both by complainant and defendant in every scale either one has ever sold. It is not clear to us that this construction will of itself substitute vertical lines of force for the oblique lines resulting in the Hotsapillar construction, but it obviously will tend to minimize the side strains, and there can be no doubt that it does either destroy them or minimize them so that they are practically negligible. Complainant's shop experts worked for several months modifying and improving the Hotsapillar device before they found it satisfactory, and all of these efforts apparently must have been directed toward the defect we have been considering. Koehne and Osborn fought out an interference in the Patent Office upon issues relating to this particular improvement, and a patent was granted to Koehne; and we have no testimony indicating that those skilled in the art could tell how to do this thing without resorting to

their inventive faculty. Under these circumstances, we cannot say that the changes in the lower part of the device necessary to make workable Hotsapillar's improvements in the upper part were within the field of mechanical skill in that particular art in 1892 or in 1894. It follows that Hotsapillar is unable to supplement his imperfect disclosure by reference to the field of common knowledge in the art, and his disclosure remains incomplete and imperfect.

We do not overlook that in the Hotsapillar model, constructed by defendant after his specification and drawings, there were retained two other defects besides the one considered, viz., the lower pivoted end of the rod had a slight lateral motion owing to the fact that the end of the platform lever would swing vertically in the arc of a circle, and the pivot between the tare beam and the vertical rod was out of the proper vertical alignment. As to the first of these criticisms, the Patent Office held that its prejudicial effect would be negligible, and we see no reason to doubt this conclusion. As to the second, it may be that it would have been remediable by the ordinary knowledge of the scale constructor, and that, if remedied, the model would have given a better performance; but we think the burden was on complainant to show that the inoperativeness of the model was due to this defect, rather than to the other defect which we have found could not be remedied without further invention; and complainant has made no effort to do so.

[2] Complainant meets this situation by the claim that the contract between the government and the patentee relates to the day of issue; that the patentee is, so far as the public is concerned, entitled to use, in any part of his machine, any equivalent known at the date the patent issues; and that, therefore, Hosapillar's specification and drawings may be supplemented by reference either to the Koehne or the Osborn patent, both of which issued before Hotsapillar's. This theory misapprehends the point at issue. The grant of letters patent is based upon a disclosure of an invention. The disclosure is made by the filing of the application. The invention is not made until there has been a reduction into practice, actual or constructive. This question must be determined by the situation existing when the application is filed. No subsequent invention by B. can have retroactive effect to transform an earlier mere conception by A. into a then completed invention. The rightful rejection of a patent application, because it does not disclose to one skilled in the art how to build and operate a machine, cannot become wrongful because before the application is abandoned some one else files an application or takes out a patent supplying the missing link. It is the date of the completed application, and not the issue date, which must be the criterion in determining the fund of knowledge in the art which the patentee can, by implication, include in his disclosure.

[3] Complainant also relies upon the effect of the Patent Office decisions in the interference between Hotsapillar and Osborn, and we may, for the purpose of this opinion, assume that the present parties are affected as Hotsapillar and as Osborn would have been. An interference award, deciding a direct issue of fact, upon the question of priority, should be adopted by the courts in subsequent litigation

between the same parties, unless there is "thorough conviction" to the contrary (Morgan v. Daniels, 153 U. S., 124, 125, 14 Sup. Ct. 772, 38 L. Ed. 657); but the rule goes no further (Hildreth v. Curtis [C. C.] 157 Fed. 394, 395). We find here that Osborn contended, before the Examiner of Interferences, that Hotsapillar's device was not operative. We do not know whether he urged the same arguments and considerations which we have been considering. The examiner decided the issue in favor of Hotsapillar, treating this point as fairly one of reduction to practice, and so within his jurisdiction. Both the Board of Examiners in Chief and the Commissioner seemed to think the point was merely one of "right to make the claim," and so was solely within the jurisdiction of the Primary Examiner and outside the power of the Examiner of Interferences to decide. For this reason, they refused to consider the merits of Osborn's contention. It is therefore clear that the Patent Office has not, according to its own construction, authoritatively passed on the question of fact we have been considering, and no adjudication exists.

From these considerations, it follows that the patent in suit is invalid, and that the decree below must be affirmed, with costs.