## COMPUTING SCALE CO. v. BARNARD CO.

(Circuit Court of Appeals, Sixth Circuit. February 13, 1919.)

No. 3181.

1. PATENTS ⟨⟩211(2)—LICENSING AGREEMENT—CANCELLATION.

Licensee to manufacture and sell a patented scale *held* to have effectively canceled its contract with the owner of the patent, under a clause of the contract between them entitling it to do so if the scale failed to be commercially successful to its satisfaction, though its notice was that it considered the device so inoperative or defective as to entitle it to cancellation, a reason which seemed primarily to rest on another clause of the contract.

2. ESTOPPEL ⟨⟩95—CANCELLATION OF CONTRACT.

If the owner of a patent knew that his licensee deemed the contract between them ended not later than the end of a royalty period to which his suit for royalties was directed, and realized that a demand by him for royalties would bring a cancellation by the licensee under another clause of the contract, and nevertheless kept silent for the longest period permitted by the statute of limitations, he would be estopped to insist that there had been no effecual cancellation by the licensee.

3. PATENTS ⟨⟩211(2)—LICENSING AGREEMENT—CONSTRUCTION.

Where the contract, whereby the owner of a patent licensed manufacture and sale, gave the licensee right to cancel if the device failed "to be commercially successful to the satisfaction" of the licensee, there was no necessary intent that commercial success could be decided only by actual manufacture and commercial sale, the reasonable meaning being that, if the licensee found itself not satisfied within the time limit specified that the device would be a commercial success, it might cancel.

4. PATENTS ⟨⟩219(5)—LICENSING AGREEMENT—CANCELLATION FOR LACK OF SATISFACTION—EVIDENCE.

In an action for royalties due under an agreement licensing the manufacture and sale of a patented scale, evidence *held* insufficient to show that defendant licensee was in fact satisfied with the scale as commercially practicable, but only pretended not to be, acting in bad faith and to injure the patent, when it exercised its right to cancel the agreement, under a clause permitting such action if the scale was not commercially successful to its satisfaction.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Action by the Barnard Company against the Computing Scale Company. To review a judgment for plaintiff, defendant brings error. Reversed and remanded.

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In July, 1907, the Barnard Company owned a patent then recently issued to Barnard, its president and manager, for improvements in computing scales. Barnard exhibited the device to the officers of the Scale Company, and they desired to obtain a right to control the invention. Accordingly, a formal and rather elaborate written contract was executed, by which the Scale Company was to have an exclusive license for the term of the patent, and was to pay an agreed royalty for each instrument manufactured. The minimum amount of royalty for the first year and a half was to be $5,000, to be paid in advance on the signing of the contract. The minimum for the next year was to be $5,000, also to be paid in advance for that year. Thereafter the annual minimum was to be $10,000, payable quarterly. The feature of the contract which controls the present controversy is paragraph 10, which reads as follows (for convenience of later reference, we identify the three clauses of this contract by inserting the reference letters a, b, c):

"10. (a) In case the said patented invention hereinbefore referred to shall, for any reason, prove to be inoperative or defective, the said party of the second part shall have the right to cancel this agreement, provided the said party of the first part fails or neglects to cure said defect within a period of 90 days after receipt of a written notice from said party of the second part setting forth said defect, and, to the best of its knowledge, the reasons therefor. (b) It is also agreed that, should said scales containing said invention or any part thereof, fail to be commercially successful to the satisfaction of the party of the second part, it may, by giving a 60-day written notice before the expiration of 2½ years from the date hereof, terminate this agreement at the end of 2½ years from the date hereof. (c) And further, if after a period of 2½ years from the date hereof, the party of the second part finds that it cannot continue to make scales containing said invention or any part thereof commercially successful and profitable, it may, by giving a 6 months' written notice to the party of the first part, terminate this contract and surrender all its rights thereunder."

Barnard sent to the Scale Company two models of complete scales with his invention—the drum form and the fan form. The Scale Company made the advance payment covering the 18-month period, which would extend until January 20, 1909, and proceeded to make experiments and tests with one of the models. On June 16, 1908, the Scale Company wrote a letter to Barnard. The letter and all copies have been lost or destroyed, and the Scale Company officer who wrote it is dead. Evidence of its contents depends on Barnard's recollection. He says that it pointed out what were said to be defects in the operation of the model, suggested causes therefor and asked that he remedy them if possible. He further says that he at once went to the Scale Company's factory prepared to undertake remedying the defects, but that he was not given any help or co-operation in so doing. The substance of the complaint, in the final result, was that the model, at certain points, varied more than half an ounce above or below accuracy. It was customary for official inspectors throughout the country to permit inaccuracies of not more than three-eighths of an ounce, this permission being known as "tolerance," but a variation of half an ounce would bring frequent condemnation.

On January 20, 1909, the Scale Company sent, and Barnard received, this telegram: "Under our privilege in clause 10 of agreement, we cancel contract between us; see our letter June 16 last year." This telegram was confirmed by letter dated January 21. On January 23, the Barnard Company replied through its attorney:

"Your telegram addressed to Arthur W. Barnard, dated January 20, 1909, has been referred to me, and I am instructed by my client, the Barnard Company, to inform you that it does not accept the cancellation of the contract, and it does not admit that under the terms of the contract referred to in the telegram, the Computing Scale Company has any right to cancel the same. I am further instructed by my client to demand the payment of the sum of $5,000 due under the terms of the contract."

After further correspondence, the Scale Company, on March 15, 1909, wrote as follows:

"We have but to refer you to our letter of June 16, 1908, wherein we call attention, specifically, to fatal defects in the Barnard invention, and these not being corrected we consider the entire matter at an end. We certainly will be pleased to consider a new proposition if Mr. Barnard or any one else whom he may employ can perfect the device so as to make a practical and commercially successful scale from the invention."

For the $5,000 installment, due January 20, 1909, the Barnard Company promptly brought suit in the New York courts, and eventually recovered judgment. Quereau v. Computing Scale Co., 148 App. Div. 860; 133 N. Y. Sup. 501. In 1916, the present suit was commenced in the court below to recover the minimum royalties which had accrued for the period of about 6 years. The defense was that the contract had been canceled. After trial before a jury, each party requested an imperative instruction in its favor, whereupon it was considered by the court and both counsel that a jury had been waived and the case submitted to the court; later, an opinion was filed, which was perhaps intended as a finding of facts, and judgment was entered for plaintiff for the minimum of royalty due when suit was commenced, and interest, viz. $83,200.

John M. Zane, of Chicago, Ill., for plaintiff in error.

Francis J. V. Dakin, of Boston, Mass., and Province M. Pogue, of Cincinnati, Ohio, for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and KILLITS, District Judge.

DENISON, Circuit Judge (after stating the facts as above). Of the three possible grounds of cancellation reserved by paragraph 10 of the contract, clause (c) may be eliminated. The situation thereby contemplated never arose. This leaves only clauses (a) and (b) as possible support for the cancellation.

Under clause (a), the question was whether the device was inoperative or defective. This seems to be a question of fact, and not of opinion or judgment. If the Scale Company had wished its own judgment to be the criterion of its right to cancellation under this clause, it would have used plain language to that effect; and this conclusion is emphasized by comparison with the ground of cancellation reserved by clause (b). As bearing on this issue of fact, the questions which stand out most prominently are: (1) Whether the "patented invention" should be considered as the entire device specified in the patent claims and necessary to make an operative scale, or only as the features which were new in this scale. See Computing Co. v. Standard Co. (C. C. A. 6) 195 Fed. 508, 513, 115 C. C. A. 418. (2) Whether, after the plaintiff had sent on his scale as a sample of the invention, operatively arranged, and it developed (if it did) that this sample could not be successfully operated, plaintiff might nevertheless insist that it could be made practical by refinements which plaintiff afterwards developed or by changes which defendant might have worked out if it had tried. (3) Whether "operative" and "defective" refer to a laboratory or to an everyday use standard. All these questions are presented on this record, not independently, but as bearing on the main inquiry whether there was substantial evidence to support the special finding on that subject or the general judgment which would imply such an underlying finding. American Bank v. Miller (C. C. A. 6) 185 Fed. 338, 342, 107 C. C. A. 456.

Since we conclude that the judgment must be reversed for another reason, and since the probability that these questions will arise again impresses us as rather remote, we think it not advisable now to discuss or decide them.

The inquiry whether the patented invention was inoperative or defective in a mechanical sense is very different from the question whether it would be a commercial success. There are sufficient reasons why this would always be true, but they are emphasized in the present case, where the device was one of extreme delicacy, where it was to be subjected to all kinds of incompetent handling and must be "fool proof," and where its accuracy must depend upon the behavior of a considerable body of mercury in a large receptacle. It would be wholly unreasonable to suppose that any manufacturer would bind himself to a large obligation which should be dependent upon the judgment of any other person or tribunal that a business would be successful. Accordingly, the Scale Company provided that if, at any time, 60 days before the end of 2½ years, it was not satisfied that the scale containing the invention was commercially successful, it could cancel the contract, but remaining liable for payment of the royalty for the 2½-year period.

[1] In our judgment, the undisputed facts make out an effective cancellation under clause (b). No doubt the Scale Company, by its telegram of January 20, had in mind a desire to end the contract under clause (a). If it could make that kind of termination effective before the January 20 payment was due, it could avoid that payment and save $5,000. Under this contract, however, there is no reason why a cancellation primarily resting on clause (a) may not also rest on clause (b). The greater always includes the less, and if a patented invention is defective, it naturally follows that it will not be a commercial success. When, therefore, the company declared, as it undoubtedly in substance did on January 20, that it considered the device so inoperative or defective as to entitle it to cancellation, it necessarily declared that the device would not result in commercial success to its satisfaction.

If there were doubt about this conclusion, it would be removed by the letter of March 15, 1909, which contains an express declaration that there are fatal defects in the invention, and that the Scale Company considers the entire matter at an end, but that it would be willing to consider the proposition anew if it could be shown any way "to make a practical and commercially successful scale from the invention." We think it beyond doubt that the Scale Company then, if not before, intended to terminate the contract, and intended to rest that action in part upon its right to cancel under clause (b), that it sufficiently declared such intention, and that Barnard could not have misunderstood this cancellation.

[2] We cannot fail to notice that, so far as this record informs us, Barnard did not, until the commencement of this suit, make any claim that the contract was not ended as of January, 1910, nor make any demand for royalties thereafter accruing. There was a further right of cancellation under clause (c), of which it was not unlikely

the Scale Company would have attempted to avail itself, if it had known that Barnard considered the contract still in force. If in truth he knew that the Scale Company deemed the contract ended not later than the end of the royalty period to which the New York suit was directed, and realized that a demand by him would bring a cancellation under clause (c), and nevertheless kept silent for the longest period permitted by the statute of limitations, it would at once be evident that he must meet the charge of estoppel so arising. The prosecution of the New York suit was not necessarily inconsistent with acquiescence by Barnard in a termination effective in January, 1910; and his letter of January 23, refusing to accept the cancellation attempted, is also not certainly in conflict with such acquiescence, because it refers directly only to the Scale Company's claim that the contract ended in January, 1909. However, the New York proceedings or other matters not in this record may show such claims by Barnard as will acquit him of any intent to mislead the Scale Company by his silence. We therefore do not rest our conclusion in any degree upon the rule of estoppel.

[3] The right to cancel under clause (b) did not depend on any precedent manufacture of the device and putting it on the market. The language used, "fail to be commercially successful to the satisfaction of the party of the second part," does not necessarily imply an intent that commercial success could be decided only by actual manufacture and commercial sale; but, under the conceded circumstances here existing, such intent would be so very improbable that only the clearest language could justify that interpretation. It was known to both parties that the actual manufacture and the attempt to sell, in any such quantities as to be a fair test of how much it would cost to make and how acceptable the device would be, would involve expenditure of thousands and perhaps tens of thousands of dollars. No manufacturer would intentionally contract that, although he was satisfied that a device would not be a commercial success, he should, nevertheless, go ahead, and put it on the market at his own risk. The reasonable meaning of this clause (b) is that, if at any time within the limit specified the Scale Company finds itself not satisfied that the device will be a commercial success, it may cancel.

[4] The only remaining question is whether the Scale Company was in fact satisfied. The legal rules applicable to this question were fully stated by this court in American v. Kussell, 232 Fed. 306, 146 C. C. A. 354, L. R. A. 1916F, 882, and there is no occasion to repeat them; the whole matter is one of their application.

We must approach this question recognizing that, since there was a general finding for plaintiff and since that finding would be sufficiently supported if the record contained evidence fairly tending to show that the Scale Company's claim of dissatisfaction was made in bad faith and while it was in truth and in fact satisfied that the device would be a commercial success, the matter of law for us to decide is whether there was any substantial evidence to that effect; but we are neither embarrassed nor aided by the presence of any finding by the district judge on that question. He was of opinion

that actual effort to put upon the market was necessary before the Scale Company was at liberty to assert its failure to be satisfied with commercial success, and hence he considered the evidence only from the standpoint of the actual merits of the article, and not with reference to whether the company was really satisfied.

We have here a device intended to be a part of a complicated mechanism, and, for its own accurate operation, dependent upon the behavior of a large amount of mercury in a receptacle and under all sorts of conditions of rough handling and of temperature. For its commercial success it was dependent not only on the actual performance of the mercury and co-operating parts, but upon what the ordinary storekeeper and prospective customer would think or believe about this operation. Any manufacturer, deciding whether to be sufficiently satisfied of the commercial success of this device to make the necessary investment, would not overlook this situation, and it emphasizes the burden of those who say that the manufacturer was satisfied when he says he was not. Putnam, C. J., in Gilman v. Lamson Co. (C. C. A. 1) 234 Fed. 507, 512, 148 C. C. A. 273. The burden in this case is unusually heavy, and the quality of that burden gives unique color to the question whether there is sufficient evidence to support the conclusion. This was an elaborate and delicate machine; plaintiff made two or three, in a period of several years; each obviously cost him a commercially prohibitive sum; nobody else ever made one; nobody ever sold one; to be a commercial success it must be sold in large numbers and for a moderate price; defendant was willing to lose its $5,000 or $10,000 rather than try to make and sell; and yet plaintiff must justify a finding that defendant was really satisfied that this untried business would be a "commercial success." It is not impossible that a plaintiff could carry even that burden; but such a claim challenges unusual scrutiny.

By this record we find that five witnesses for the Scale Company—all who had anything to do with the matter and who are living—testify that they tested and experimented with the drum model furnished by Barnard, some of them casually and some of them thoroughly, and that it would not operate accurately and reliably. Three of them, the factory superintendent, the expert, and the skilled workman especially charged with the duty, continued their experiments and tests over several weeks, and finally the model was condemned as "no good." They all agree that it not only would not work with the necessary accuracy, but that, by the aid of whatever knowledge and skill they had, they could not make it work and did not know how to do so. In addition, it appears that Barnard seemed to acquiesce in the conclusion that this model was not satisfactory in its then condition, and that when, considerably later, Barnard undertook to produce a perfected example, the task occupied him and a skilled worker some 6 months.

As against this, we find nothing, excepting certain circumstances, which are said to show bad faith in the claim of dissatisfaction. We are not impressed that these, singly or collectively, have any substan-

tial tendency in that direction. We will consider them briefly. They are:

(1) That the contract was oppressive and harsh as against Barnard, and suggests overreaching. We cannot so regard it. There seems no reason to doubt that the Scale Company agreed to pay and did pay a fair, if not a liberal, price for an option of 2½ years upon an untried and uncertain invention. Of course, the invention would be somewhat discredited, if it were to be rejected at the end of that time; but that the Scale Company would pay $10,000 for the sole purpose of temporarily suppressing and later disparaging the invention is mere surmise.

(2) That the Scale Company officers did not go to work to build new models or co-operate with Barnard in the effort to make the device successful after they had made up their minds that it was unsatisfactory. This is true; but they were under no obligation to do so.

(3) That they reached their conclusion adverse to the success of the device as early as the first of the year 1908, and did not give any notice till June, or attempt to cancel until the next January. This, also, is true, but it does not militate against their good faith. They had paid for the exclusive right to the invention till January 9, 1909, and if they had concluded that they did not want the license for the further term, there was no reason why they should turn it back until the paid-up term expired.

(4) That they tested only the drum model, and did not test at all the fan model. True; but two-thirds of their product was of the drum style, and, unless the device would be successful on that style, it is not to be supposed that they would want to buy it for use on the minor fraction of their output and at the price contemplated for the whole. If the drum style was not satisfactory, it would be a waste of time to experiment with the fan style.

(5) That the model made, first exhibited to some of the officers of the Scale Company, satisfied them of its performance. This is true; but it was only in a preliminary and general way. If that provisional acceptance was to foreclose a later rejection, there was no occasion for either clause (a) or (b) of paragraph 10. It will not do to say that acceptance of a device as good enough to give a thorough try-out with an agreement to purchase if found commercially satisfactory, is itself evidence legally tending to show that it later was found to be satisfactory; this makes the contract self-destructive.

(6) It is also said that the difficulties, which led to the rejection of the scale, had to do with other parts than those which constituted plaintiff's invention; hence, that a rejection for these reasons could not be in good faith. If it were to be assumed that plaintiff's invention pertained only to his new parts, and not to the whole combination, still this claimed result could not follow. The motion of the weight and price indicating devices was to be governed by the extent to which a plunger would descend into the mercury. It would do so until it had effected sufficient displacement of the mercury to stop its descent. Obviously, the result would depend in essential degree upon the precise shape and size of the plunger. The evidence

is highly persuasive that the Scale Company's experts abandoned their work with the model after concluding that sufficient precision in these respects was a matter of infinite "cut and try" with reference to every varying model, and that there was no scientific method of ascertaining the necessary proportions. The expert workman who, as a witness for the Barnard Company, said he succeeded in making a perfect instrument, also testified that part of the time spent by him in its perfection—six or eight months—was spent in this "cut and try" adjustment of the plunger to the demands upon it. It is true there was testimony at the trial indicating that a method of scientific determination could have been developed by one sufficiently expert, but there is nothing to indicate that either plaintiff or defendant knew this until long after the end of the two and a half year period. However, even a conclusion that the trouble was due to defects in other parts of the scale would be unavailing, for clause (b), unlike clause (a), has reference not to "the said patented invention," but to "said scales containing said invention, or any part thereof."

(7) Defendant's expert, who made the final tests and condemnation, testifies:

"I finally came to the conclusion that on account of the extreme difficulty in getting a combined and perfect action of the whole system, as being somewhat of the 'cut and try' principle, and no rule or system by which the scales could . be produced expeditiously and accurately without too much experimenting and the cost of the same being so great, that I considered that the device was not practicable as a machine to be manufactured with profit, taking into consideration the various devices which the Computing Scale Company already had in hand. However, I gave it a final test before abandoning work upon it, but with no better success."

It is suggested that the phrase "taking into consideration the various devices which the Computing Scale Company already had in hand" supports an inference of bad faith in the rejection. On the contrary, this was one of the very considerations rightly to be observed in deciding whether "the device was practicable as a machine to be manufactured with profit"—in other words, whether it would be "commercially successful." Surely, the contract did not contemplate that the Scale Company should discontinue or turn away from other more simple and more profitable forms, and confine itself to this. This device could not be "commercially successful" in the fair sense implied by those words in this situation, and so as to justify paying $10,000 a year for its use, unless it could stand comparison with the other things for which it was to be substituted or which might be substituted for it.

Upon the whole case, we cannot escape the conviction that even if it be assumed that there is evidence tending to show the device to have been good enough so that the Scale Company ought to have been satisfied that it would be a commercial success, this is the extreme limit of the tendency of the proofs; that to allow the testimony in this record to prevail against the rejection of the article would be to overlook the established and peculiar force of contracts "to satisfy"; and that to support the conclusion that the Scale Company was in truth satisfied but only pretended not to be, acting in bad faith and with the intent to injure Barnard's patent, there is only suspicion. This is

not enough. Ferrell v. Prame (C. C. A. 6) 236 Fed. 727, 728, 150 C. C. A. 59.

The judgment must be reversed, and the case remanded for a new trial.