## HUNT et al. v. STIMSON et al.

Circuit Court of Appeals, Sixth Circuit. January 3, 1928.

No. 4743.

1. Sales ⬥1 (4)—Contracts to sell and buy output of going manufacturing operation are mutually binding.

Contracts to sell and buy the output of a going manufacturing operation are mutually binding, even if there is no definite obligation on either side to the extent of a named quantity.

2. Sales ⬥1 (4)—Contract for sale of 10 to 20 carloads of lumber, covering amount actually produced and ready for shipment during specified period, held valid contract for output.

Contract for purchase and sale of white ash lumber, "10 to 20 carloads covering the actual amount we produce and have ready for shipment during the time above mentioned," *held* sufficiently definite to constitute a valid contract for output, consisting of the quantity of lumber of kind specified ready for shipment during the period specified within the minimum and maximum limits specified.

**3. Sales ⟪⟫71(5)—Sellers held to have right of choice as to maximum and minimum limits under contract for sale of 10 to 20 carloads of lumber, to be shipped during specified period.**

Under contract for purchase and sale of white ash lumber, "10 to 20 carloads, covering the actual amount we produce and have ready for shipment during the time above mentioned," *held* that, disregarding the output feaure of the contract, sellers and not buyers had right of choice as to maximum and minimum limits, whether contract be treated as ordinary one with such limitations, or be judged by the rule of the "first actor," or the rule that the choice lies with the one for whose benefit the option is given.

**4. Sales ⟪⟫81(1)—Sales contract, requiring delivery within three months ending June 15th, and requiring completion July 1st, held not to entitle buyers to demand completion until July 1st.**

Where contract for sale and purchase of lumber, dated March 15th, requiring shipments "during the next three months," which would make contract expire June 15th, further provided, "delivery to be completed by July 1st," *held*, that delivery on or before June 15th was contemplated, but buyers had no right to demand it until July 1st.

**5. Contracts ⟪⟫10(1)—At law, contract is not invalid for lack of mutuality, unless there is no consideration.**

Lack of mutuality in a contract may bar relief in equity, but in courts of law that defense rests on the legal rule that a contract must be supported by consideration, and at law it is only as respects contracts where there is no consideration for the promise sued on, except plaintiff's correlative promise that question of mutuality becomes important.

**6. Contracts ⟪⟫10(4)—Contract requiring seller to sell without requiring buyer to purchase, except at his pleasure, is valid, if supported by sufficient consideration, and vice versa.**

Contract imposing on seller an obligation to sell, but putting no duty on buyer to buy, except at his pleasure, is completely valid, if buyer parts with sufficient consideration to support seller's promise, and the situation is the same where buyer definitely agrees to buy, though seller has option to sell or not.

**7. Contracts ⟪⟫10(4)—Optionee's promise to give substantial time and effort to investigating any question is sufficient consideration for promise to sell or buy, if he thereafter decides to do either.**

A promise, contained in a contract and made by the optionee, to give substantial time and effort to investigating any question, like the value of the property, which he must consider before he decides whether or not to exercise the option, is a sufficient consideration for the option to sell or buy, if the optionee thereafter decides to buy or sell.

**8. Contracts ⟪⟫10(4)—Sale contract, authorizing sellers to cancel if buyers' complaint respecting shipment could not be satisfactorily adjusted, held not void for lack of consideration.**

Contract for sale and purchase of lumber, providing that if, after an inspection of any shipment buyers' complaint as to quality, measurements, or other features, cannot be adjusted, lumber shall be returned to sellers on their request, and reserving in sellers the right to cancel the order, *held* valid as against objection that it lacked consideration, since sellers were obliged to make at least one shipment, to be inspected by buyers, which furnished consideration for their option to cancel.

**9. Contracts ⟪⟫10(4)—Before cancellation clause can invalidate contract for lack of consideration, sellers' option to cancel must be arbitrary.**

Before cancellation clause in sale contract can be interpreted to give sellers an absolute option to discontinue, so as to make contract invalid for lack of consideration, it must appear that their right to do so is arbitrary, depending on their own unregulated decision.

**10. Contracts ⟪⟫10(4)—Sale contract held not void for want of consideration, because of sellers' reservation of right to cancel if dispute could not be satisfactorily adjusted.**

Contract for sale of lumber *held* not invalid for want of consideration, because of sellers' reservation of right to cancel contract if buyers' complaint respecting shipment cannot be satisfactorily adjusted, since sellers did not have absolute right to cancel, but such right was dependent on buyers' voluntary act, and on inability to satisfactorily adjust dispute.

**11. Contracts ⟪⟫10(1)—Promisor's right to renounce contract for good cause does not make his promise nonenforceable, or destroy its effect as consideration for counter promise.**

The right of a promisor to renounce contract for good cause does not make his promise nonenforceable, nor destroy its effect as consideration for a counter promise, and the parties may in their contract specify what the good cause for cancellation shall be.

**12. Evidence ⟪⟫474(5)—Competency of testimony respecting sellers' ability to perform held not affected by alleged lack of personal knowledge of witness, disclosed on cross-examination, this going only to weight.**

In sellers' action for buyers' breach of contract to purchase lumber, to be shipped during specified period, competency of testimony of sellers' sales manager respecting quantity of lumber of kind covered by contract on hand in sellers' yards during contract period, offered to show sellers' ability to perform, *held* not affected by his claimed lack of personal knowledge, alleged to have been disclosed on his cross-examination, but this went only to its weight.

**13. Evidence ⟪⟫474(5)—Testimony of sellers' sales manager as to quantities of lumber in yards, to show ability to perform, based on estimates and tallies prepared by others, held admissible.**

In sellers' action for buyers' breach of contract to purchase lumber, testimony of sellers' sales manager as to quantities of lumber on hand during contract period, offered to show ability to perform, based on his recollection of estimates from personal inspection of yards and tallies made up by other employees, which had been destroyed, *held* admissible.

**14. Sales ⟨=⟩382—Prices of lumber held properly ascertained by apportionment to different thicknesses, based on average and customary run of lumber.**

In sellers' action for buyers' breach of contract to purchase lumber, *held*, that it was permissible for sellers' sales manager to ascertain prices of lumber by apportionment to different lumber thicknesses, based on the average and customary run of such lumber.

In Error to the District Court for the Western District of Kentucky; Charles I. Dawson, Judge.

Action by Charles E. Hunt and others against J. V. Stimson and others. Judgment for defendants, and plaintiffs bring error. Reversed and remanded for new trial.

M. S. Ross, of Nashville, Tenn. (J. S. Laurent, of Louisville, Ky., and La Vega Clements, of Owensboro, Ky., on the brief), for plaintiffs in error.

Thos. E. Sandidge, of Owensboro, Ky. (E. B. Anderson and Sandidge & Sandidge, all of Owensboro, Ky., on the brief), for defendants in error.

Before DENISON, DONAHUE, and KNAPPEN, Circuit Judges.

DENISON, Circuit Judge. Plaintiffs in error, a partnership, with headquarters at Nashville, Tenn., were manufacturers of lumber, controlling several small mills in Tennessee, and owning a mill in Georgia. They received from defendants in error an order for certain ash lumber, and acknowledged the order by letter dated March 15, 1920, the essential parts of which are as follows:

"J. W. Stimson & Co., Owensboro, Kentucky. We enter your order, dated March 12, 1920, No. 1195, and accept and agree to fill the same only upon the conditions herein stated. To be consigned to you as directed. Terms: * * * Frt. allowed on present rate of freight, f. o. b. Nashville or Blakely, Ga. * * * To be shipped during the next three months—delivery to be complete by July 1, 1920. * * * The conditions upon which we accept this order are stated herein, and no agent or representative has any authority from us, except to solicit orders. * * * The acceptance and filling of orders, and all questions about settlements, adjustments, and remittances, are to be taken up with us direct at Nashville. If, upon arrival and inspection of any shipment on this order, there is any complaint to be made, about quality, measurement, widths, lengths, dryness, or any other feature of such shipment, the car shall be held intact, subject to our inspection and order, and complaint made in not less than 5 days after car is unloaded. If the complaint cannot be satisfactorily adjusted, the lumber is to be returned to us upon our request, and we reserve the right to cancel the order covering any lumber on this contract. * * * Ten to 20 carloads—covering the actual amount we produce and have ready for shipment during the time above mentioned. Firm texture white ash at the following prices: [Here follows a schedule of sizes and prices and loading specifications—prices ranging from $275 for 4-inch timbers of the highest quality down to $75 for 1-inch No. 2 common.] If your order is not properly entered above, and the conditions of this contract agreeable, we will expect immediate advice; otherwise, we will expect you to be governed by same."

This was accepted by the purchasers and became the contract. During the period named six cars were shipped. No dispute arose. The vendees then neglected or refused to give further shipping directions, and eventually denied liability to receive any more. The vendors brought this action, claiming damages for the failure to receive the remaining 14 cars out of a total of 20. At the close of plaintiffs' evidence upon a jury trial, the court below directed a verdict for defendants, for the reasons that the contract imposed no legal obligations, and that the plaintiffs had not proved that they were ready and able to perform.

[1] The mutually binding force of contracts to sell and buy the output of a going manufacturing operation is now well settled, even though there is no definite obligation on either side to the extent of a named quantity. Pittsburgh Co. v. Neuer Co. (C. C. A. 6) 253 F. 161.

[2] We have no hesitation in classifying this contract as one for output, modified by the minimum and maximum limits. At the different mills the vendors were engaged in cutting timber of all kinds as it came along from a complete cutting operation. This brought to the saws at Blakely and at the Tennessee mills continuing quantities of ash, more or less, as might happen. This was cut into lumber of such thickness as good sawmill practice permitted. The result was that there was a continuing more or less regular production of ash lumber of the sizes and grades specified. True, the vendors might measurably decrease or increase the quantity by some selection of timber to be cut or logs to be sawed; but the contract kept this selective right within limits

23 F.(2d)—29

which were agreed upon as reasonable. The contract was therefore sufficiently definite to indicate a meeting of minds.

[3] The feature next noticeable is presented by the maximum and minimum limits. Which party had the right of choice? It is not clear that this question, as an independent one, exists, because it is modified by the output feature; but if the contract were to be treated as an ordinary one with such limitations, and whether it were to be judged by the rule of the "first actor" or by the rule that the choice lies with the one for whose benefit the option is given (see full discussion in Crystal Co. v. Robertson Co. [C. C. A. 6] 289 F. 15, 18), the vendors, not the vendees, had the right to elect. The elasticity was allowed for their benefit, and the first step was for them to .produce and have ready for delivery the first shipment that might be specified.

. We think, therefore, that the contract contemplated and covered all of the firm texture white ash boards of the specified sizes and of the vendors' production which should be ready for shipment during the time specified, and extended to 20 cars, if so much were ready. A literal reading would confine the subject-matter to lumber which was produced by the vendors after March 15, but this is not the reasonable meaning. The vital thing was that the lumber should be ready for shipment. There might be, as there was in fact, a small amount which was ready for shipment on March 15, and which the conduct of the parties showed they intended to include. We think it more reasonable to say that the phrase "which we produce" was intended merely to identify the lumber as the vendors' product, and, plainly, if it was ready for shipment on March 15, it was ready "during the time above mentioned."

[4] A question is made as to the period of the contract. It says "during the next three months." In precision the time would expire June 15. Then the contract continues: "Delivery to be complete by July 1, 1920." These clauses should be read together and reconciled. In our judgment, the proper construction is that delivery on or before June 15 was contemplated, but that the additional tolerance or grace period of two weeks was provided for. The vendees might fairly expect completion by June 15. They could not demand it until July 1.

[5-7] The serious question which is made as to the validity of the contract depends upon the cancellation clause above quoted. It is said that, if either party to an executory contract retains the right to cancel it at his pleasure for any remaining period, it imposes no positive obligation on him, and the contract fails for lack of mutuality. The general principles applied in courts of equity may develop a lack of mutuality into a bar to relief; but in courts of law that defense rests on the legal rule that a contract must be supported by consideration, and at law it is only upon a contract where there is no consideration for the defendant's promise sued upon, except · the plaintiff's correlative promise, that the question of mutuality becomes important. See the full and satisfactory discussion by Circuit Judge Woolley, in Meurer Co. v. Martin (C. C. A. 3) 1 F.(2d) 687.[1] This is well illustrated by the familiar option contract of purchase or sale. A contract which imposes on the vendors an obligation to sell, but puts no ˋduty upon the vendee to buy, except at his pleasure, will be completely valid, if the vendee parts with sufficient consideration to support the vendors' promise; and the situation must be the same, where the vendee definitely agrees to buy, though the vendors have an option to sell or not; and relatively small considerations are held sufficient.

A promise contained in the contract and made by the optionee to give substantial time and effort to investigating any question, like the value of the property, which he must consider before he decides whether or not to exercise the option, is a sufficient consideration for the promise to sell or ˋbuy if the optionee thereafter decides to buy or sell. See 23 R. C. L. p. 1291, § 106. Necessarily, this same thing is true if the contract contains any substantial and valuable promise by the one to whom the option is extended—assuming that the different parts of ˙the contract are not properly separable. This is illustrated by the cases involving oil leases, which hold them valid contracts, even though the lessee has an optional right to surrender. See Lindley v. Raydure (D. C.) 239 F. 928, affirmed by this court 249 F. 675; Leeper v. Neely (C. C. A. 6) 293 F. 967; Miller v. Union Co. (C. C. A.

---

1 See, also, discussion in Williston on Contracts, § 140. He says that the statement of necessity for mutuality to make a contract valid is likely to cause ·confusion, since .it is at best an unnecessary way of saying that there must be consideration, and that this confusion has especially arisen where one party is given an option of cancellation, etc. To the instances given by him might perhaps be added Dennis v. Slyfield (C. C. A. 6) 117 F. 474, 477. Though lack of mutuality is there the stated defect, it is clear that in the case itself, as well as in the cases cited, there was no consideration for defendants' promise, except the revocable promise of the plaintiff.

6) 295 F. 27. These cases touch also other doctrines, but the principle of decision, in part, at least, seems to be that the contract is valid in spite of the lessee's option to surrender, because the lessee has given his promise to begin his performance before there would normally be any exercise of his surrender right.

[8] In one aspect of the cancellation clause found in this record, it tends to reveal the plaintiffs' contract to make the later contemplated shipments as a mere option. The utmost meaning possible in this direction is to interpret the contract as if it read: "We will make at least one shipment, but will make the remainder only if we wish to do so." Such a contract may seem a harsh one; but, if the vendees think the obtaining of at least one and probably more shipments is of substantial value to them, it is not easy to see how a promise to accept the remaining shipments, if they are sent, is without consideration. We think the vendees' promise, even in this aspect, is valid.

The vendors were obliged at all events to continue to produce the lumber, and pile it and dry it for shipment, and withhold it from other purchasers until the time that complaint should be made. This could not be until after the first shipment. They were under legal obligation to maintain this situation until nearly the end of the three months' period, if they did not sooner get the shipping directions. It is clear, we think, that the vendors' promise to get out the lumber and have it ready was an indivisible part of the consideration for the vendees' promise to take it, and hence the right of the vendors to discontinue performance upon the happening of a later condition, if it should happen, did not leave the vendees' promise unsupported. The case is, in our judgment, rather a stronger one for the plaintiff than is the Meurer Case.

[9, 10] However, the same result may rest as well upon another reason. Before the cancellation clause can be interpreted to give vendors an absolute option to discontinue, it must appear that their right to do so is arbitrary, depending on their own unregulated decision. Since in this contract the vendors' right to cancel does not arise unless the vendees first make a complaint, which they are under no obligation to make unless they wish to, it is evident that the vendors cannot, by their own action, bring about the situation which may develop their right to cancel, unless they deliberately ship lumber which is so far from compliance with the contract that they know they will thereby force the vendees to complain. The Supreme Court considered a similar situation in Small Co. v. Lamborn & Co., 267 U. S. 248, 251, 45 S. Ct. 300, 302 (69 L. Ed. 597). In that case the vendor had the right to withdraw if the refinery from which he should be getting his sugar should be interrupted by war conditions, etc. The court said: "It is idle to suggest, as was done in argument, that the clause would permit him to avoid delivery by merely selecting a refinery which by reason of war conditions, embargoes, or strikes was already cut off from a supply of raw material. That would not be within either the letter or the spirit of the clause, but would be a palpable fraud and unavailing."

Aside from the presence of consideration sufficient to support an option contract, and without regard to the view that the vendors' right of cancellation is dependent on the vendees' voluntary act, there is another reason urged as inconsistent with any arbitrary or merely optional right to cancel. The contingency which would justify cancellation is not merely that a dispute must arise, but that the dispute turns out to be incapable of satisfactory adjustment. The controlling question from this further aspect must be whether the vendors have the arbitrary right to refuse to continue shipments. Except for this cancellation clause, it was the duty of plaintiffs to manufacture and ship the lumber, as specified. It was the duty of defendants to give shipping directions and to accept and pay for the lumber as agreed. No dispute could arise, excepting as to the performance of some duty by one party. Since a dispute cannot be satisfactorily adjusted by the parties, unless both join in adjustment, and since it is the vendor who, lacking such adjustment, may cancel, the language used necessarily means (the vendors speaking), "if a dispute arises and any adjustment which you tender or approve is not satisfactory to us." Thus we have a "satisfaction" contract. The vendors may terminate if (speaking to the vendees) "you do not perform your obligations to our satisfaction—either to our initial satisfaction or to our satisfaction after consideration of the dispute which arises between us." The right of the vendors to renounce is not so bald as in an ordinary "satisfaction" contract; it is less arbitrary, because a dispute must first arise before the element of satisfaction comes into play. This would necessarily imply a good-faith dispute; but, at the best, from the vendee's position, the contract cannot give any greater right to the vendors than to renounce it if they are not satisfied with the vendors' conduct in the performance.

These "satisfactory" provisions have been the subject of much controversy, and, generally speaking, the validity of such a provision is settled. Goltra v. Weeks, 271 U. S. 536, 548, 46 S. Ct. 613, 70 L. Ed. 1074. Its effect upon the validity of the whole contract, as thereby leaving no enforceable promise to serve as consideration for the counter promise, is another question. With reference to personal service contracts providing for covering certain territory to the employer's satisfaction (American Music Stores v. Kussel [C. C. A.] 232 F. 306, L. R. A. 1916F, 882), and with reference to the proposal that a patented invention should be commercially successful to the satisfaction of the manufacturer (Computing Co. v. Barnard [C. C. A.] 259 F. 250), and with reference to the provision that territorial agents should perform their duties to the satisfaction of the manufacturer (Mills-Morris Co. v. Champion Spark Plug Co. [C. C. A.] 7 F.[2d] 38), this court has held that "dissatisfaction" means actual dissatisfaction, and not a mere pretense thereof, adopted as a subterfuge for the really moving reason. Since in the present case the condition is that a dispute cannot be "satisfactorily adjusted," it may be urged with some force that the three cases just cited do not apply, because the question suggested involves only business good sense, and does not imply any degree of fancy, taste, or judgment; but this we find unnecessary to decide.

[11] Of course, the right of a promisor to renounce for good cause does not make his promise nonenforceable nor destroy its effect as consideration for a counter promise; equally of course, the parties may in their contract specify what the good cause for cancellation shall be, and may ordinarily be as liberal as they please in specifying; and if they choose to agree that a "reasonable dissatisfaction" shall be good cause, it would seem that this, too, would be without effect upon the sufficiency of the consideration for the counter promise. See 6 R. C. L. p. 689, note 16. If they go further, and agree that actual dissatisfaction, with or without good cause, will justify renouncement, the question of consideration has a somewhat different aspect; but, since we are satisfied that, even if the right to cancel could rightfully be exercised arbitrarily after the specified precedent situation arose, the vendees' contract would nevertheless be supported by sufficient consideration, it becomes unnecessary to decide the features of the case presented by the "satisfactorily adjusted" clause. We conclude, therefore, that the contract here in suit is not invalid for any of the reasons assigned.

[12] The testimony for the plaintiff was that of Mr. Washington, who was the general sales manager of the vendors' apparently somewhat extensive lumber business. He said he was constantly familiar with their lumber yard at Nashville, where the lumber cut in Tennessee was currently assembled, and with their mill and yard at Blakely, and he testified that on July 1, 1920, there was in these yards available for delivery under this contract a total of 296,000 feet, while the normal capacity of the 14 undelivered cars would be 210,000 feet. The prima facie sufficiency of the showing thus made as to ability to perform would not be questioned, but the claim was made that his cross-examination showed such a lack of personal knowledge on his part as to make his testimony incompetent; and it was all stricken out.

[13] We think that such objections as there were went to its weight, not its competency. The question might be different if there were not such a margin of safety in the estimate—some 40 per cent. The witness said that lumber suitable for this delivery was piled in separate piles, that he saw all of them, that he participated in tallying many of them, and that from observation of such a pile he could estimate its quantity with fair accuracy. This alone would make his testimony admissible. For the details of the tallies, as well those made by him as those made wholly by others, he relied upon the current tally sheets turned in in the regular course. These were not preserved, nor was there kept and preserved any yard stockbook or similar current inventory of shifting quantities. Hence the witness had only his memory of the former memoranda; but that is so aided by the circumstances as to entitle it to jury consideration. He was the sales manager; he necessarily must keep informed as to the amounts currently available for sale of different kinds and grades; these piles had been sold under this contract, and before July 1 questions had arisen; plaintiffs' ability on that day to perform would naturally have been examined, and the important facts then apparent would naturally have been remembered. His conclusion based on such estimates and recollection was admissible. See The Spica (C. C. A. 2) 289 F. 436, 443.

[14] It is true that his ascertainment of prices, by apportionment to different lumber thicknesses, was based on an average and customary run of such lumber; but this was permissible. Commercial Co. v. Marshall (C. C. A. 6) 18 F.(2d) 457 [4].

The judgment is reversed, and the case remanded for new trial.