## McELRATH v. INDUSTRIAL RAYON CORPORATION et al.

### No. 72 Equity.

District Court, W. D. Virginia, at Roanoke.

Sept. 30, 1940.

. A. M. Holcombe, of Washington, D. C., and A. L. Hughson, of Roanoke, Va., for plaintiff.

F. O. Richey, of Cleveland, Ohio, and Cocke, Hazlegrove & Shackelford, of Roanoke, Va., for defendants.

PAUL, District Judge.

This is a suit in equity based on alleged infringement of a patent and praying the customary remedies of injunction against further infringement and for accounting for profits heretofore made through such infringement. · The plaintiff is a resident of Roanoke, Virginia, while the defendants are the Industrial Rayon Corporation, a corporation of the State of Delaware, having its principal office at Cleveland, Ohio, and Industrial Rayon Corporation of Virginia, having its principal office at Covington, Vir-

ginia, in this district. The last named corporation is a subsidiary of the first and the defendants are engaged in the business of manufacturing the fibrous material commonly known as rayon.

The patent in suit, No. 1,751,165, was granted to the plaintiff March 18, 1930, on an application filed November 9, 1927, and is designated in the patent as "Apparatus for Chemical Teratment of Fibrous Material". Throughout this suit it is referred to as a "bleaching machine", due to the fact that in the patent the description of its method and purpose of use relates to its use for the bleaching of material, and the alleged infringing machine is used for that purpose. The evidence in the case, with the exhibits introduced, has been voluminous and no attempt can be made to recount it in detail. But because the factual situation differs in marked respects from that encountered in most patent suits heard before this Court, and because certain facts involved in the obtaining of the patent and in the defenses to the suit are of importance, a somewhat extended outline of the facts proven is necessary.

The scene of the alleged conception of the plaintiff's invention, as testified by him, was the plant of the Viscose Corporation of Virginia at Roanoke. This corporation is engaged in the manufacture of rayon yarn and is one of several subsidiaries of the Viscose Corporation of America, whose headquarters and principal plant are located at Marcus Hook, Pennsylvania. The Viscose Corporation of America is controlled by Courtaulds, Limited, an English concern operating rayon plants throughout Great Britain and possibly elsewhere. In the course of producing rayon yarn for the market it is customary, after the filament has been formed by the chemical processes adapted to that end and has been made into hanks or skeins, to subject these skeins to a bleaching and washing process. This is accomplished by subjecting the skeins to a succession of chemical baths or sprays, each consisting of a different solution. In the Viscose plant at Roanoke, these successive baths are described in order as sulphiding, sulphide washing, bleaching, acidulating and final washing. The same process essentially seems to be in practice in all rayon plants with possibly some variation in the chemical make up of the successive washes.

It appears that in 1914 an Englishman named Clayton had obtained a patent in the United States (No. 1,116,242) on an "Apparatus for Liquid Treatment of Hanks of Thread, etc." Briefly and non-technically described, and omitting details of construction, this machine consisted of parallel rails spaced some five or six feet apart and elevated an appropriate distance above the floor upon which a succession of slender cylindrical rods were placed transversely with the ends of the rods supported by the parallel rails. The rods were removable and the skeins of yarn to be treated were hung on the rods (a number on each rod) before the rods were rested on the rails. Means were employed for moving the rods slowly along the rails during which movement the yarn was subjected to a continual spray, from above, of the appropriate chemical solution. Means were utilized for rotation of the rods as they moved through the machine, for reasons connected with effective spraying of all parts of the skeins. The operation of the machine was continuous in the sense that as it operated it was necessary only to continue placing the rods carrying the skeins in one end of the machine and, after their passage through the machine, remove them at the other end. Drip pans or tanks underneath caught the dripping chemicals.

While the Clayton machine was invented before the development of the rayon industry in America, it was well adapted for use in the rayon bleaching process. Prior to and during the year 1925, a number of these Clayton machines were in use for this purpose in the Viscose plant at Roanoke. As above noted, the bleaching process for rayon involves subjection of the yarn to five successive and different sprays; and it was the practice at the Viscose plant to align five of these machines in a row, end to end, with intervals between. In the first machine, the rayon was subjected to the first required spray and after the rods bearing the rayon had traversed this machine they were lifted off and placed on the second machine where the rayon received the second treatment; after passing through the second machine they were similarly placed on the third machine for the third treatment, and so on, until they had been subjected to each of the various sprays required. The yarn was then removed from the rods and placed in a hydro-extractor for drying. In this practice, each of the Clayton machines (or units) operated by its own motive power and the removal of rayon from one machine to the next in order was accomplished by manual means; i. e., as the rods bearing the rayon skeins completed their movement through one machine they were lifted by

hand, carried across the short intervening space to the next unit, and placed in position for movement through that machine. In this manner the rayon passed through each of the five units. It is noted that in the Vicose plant it was customary to refer to a group of Clayton units (five) necessary to complete the bleaching process as a "machine". That is, in factory parlance a bleaching "machine" was a group of five Clayton units, and there were several of these groups designated as "No. 1 machine, No. 2 machine", etc.

### History of the Patent and Nature of Its Claims

The plaintiff, McElrath, entered the employ of the Viscose Corporation at the Roanoke plant on November 19, 1925, as a draftsman in the engineering department. He continued in this employment for about 3½ months, until March 4, 1926, on which latter date he was discharged for reasons the exact nature of which does not appear, but under circumstances which his superior describes as "strained". According to plaintiff's testimony, it was during this period of employment and immediately after it began that he conceived the invention on which he first filed application for a patent approximately two years later and which resulted in the patent in suit. To make clear the issues in the suit, it is necessary here to set forth the nature of this patent and of those claims of the patent of which infringement is alleged. As stated, the patent is designated "An Apparatus for Treatment of Fibrous Material". The claims of the patent alleged to have been infringed by the defendants here are Nos. 10, 11, 12, 20, 21, 26 and 27, reading as follows:

"10. An apparatus comprising a plurality of alined spaced machines for subjecting fibrous material to the action of liquid, each machine having individual means for applying and collecting said liquid, and drainage space between successive machines, means for conveying said fibrous material from one machine to the other, comprising movable rails and supporting rods, said rails extending through the apparatus, including common means for operating said conveying means and said rods."

"11. An apparatus comprising a plurality of machines for subjecting fibrous material to the action of liquid, each machine having individual means for applying said liquid and for collecting the drip separately from the other machines, and drainage space between successive machines, means for conveying said fibrous material through said apparatus, including supporting rods and rails therefor extending continuously through between said machines, mechanism for progressively moving said rods along said rails through and between said machines, and power means for operating said machines in unison."

"12. An apparatus comprising a plurality of machines for subjecting fibrous material to the action of liquid, each machine having means for applying said liquid and for collecting the drip separately from the other machines, and drainage space between successive machines, means for conveying said fibrous material through said machines automatically and through said apparatus, including supporting rods and means adapted to rotate said rods in opposite directions in successive machines, whereby uniform treatment of said fibrous material is secured, and common power means for operating said apparatus in unison."

"20. An apparatus comprising a plurality of alined spaced machines for subjecting fibrous material to the action of liquid, each machine having individual means for applying and collecting said liquid, automatic means for conveying said fibrous material from one machine to the other across the intervening space and through said apparatus, including supporting rods and rails therefor connecting said machines, and power means for operating said apparatus in unison."

"21. An apparatus comprising a plurality of spaced machines for subjecting fibrous material to the action of liquid, each machine having individual means for applying said liquid and for collecting the drip separately from the other machines, means for conveying said fibrous material through said machines, including supporting rods and rails, and transfer means for automatically conveying said rods from one machine to the other; in combination with power means for operating said apparatus in unison."

"26. Apparatus for treating fibrous material with a liquid, which consists in successive machines for subjecting the same to individual treatments, supporting rods for said fibrous material spaced equidistant apart and progressively moved from one to another of a plurality of machines, said machines having provision for drainage, whereby said fibrous material is drained between said machines through a space as much as four times the spacing of said

rods and power means operating said machines in unison."

"27. Apparatus for treating fibrous material with a liquid, said apparatus having means·for subjecting the same to individual treatments comprising supporting rods spaced equidistant apart and rails for moving said rods simultaneously in a plurality of machines, said machines, having provisions for drainage between them spanned by said rails, whereby said fibrous material is drained between said machines through a space as much as four times the spacing of said rods, and connections to progress said rods through said apparatus driven by means of a common power source."

When the formal verbiage of these claims is reduced to simple language, it will be seen that the improvements claimed consisted of applying to a group of Clayton (or similar) machines means whereby the rods bearing skeins of yarn could be moved from one unit of the group to the succeeding unit by mechanical means and whereby all of the units could be operated by a common source of power; noting also that the units were spaced sufficiently apart to allow drainage of the yarn in its movement between the units. In other words, what this patent proposed was that the rails on which the rods moved in the separate Clayton machines be made continuous between the units so that the rods would continue moving along the rails from one unit to the next without manual handling and with opportunity for the skeins to drain between leaving one unit and entering the next. And having thus joined up the separate units he proposed to apply power in such means as to operate them in unison. The advantages claimed were in dispensing with the manual effort in transferring the rods from one unit to the succeeding one and in the uniform rate of movement through the separate units by having them all operated by one source of power instead of a separate power source for each unit. What is termed an "apparatus" in the patent was really one big machine composed of a number of Clayton machines operated by one source of power and so joined up that the rods carrying the yarn could pass through all of the necessary sprays without manual handling.

Because of other important evidence in the case, which will be hereafter discussed, it should be emphasized that the essential features of which the plaintiff claims invention, and of which he alleges infringement, are the connecting of the separate units to permit mechanical movement of the skein-bearing rods from one to the other, the operation of all units from a common power source, and the drainage space between units. These three features are the limit of his claimed patentable novelty. The evidence in this case took a wide range and considerable testimony was given as to the particular mechanical devices by which the rods were moved through the machine of the patent and the nature and means of their revolving movement as compared with similar movement and revolution in other bleaching machines. In the view of the Court, this testimony appears immaterial on the issues involved here. I do not understand that the claims in suit involve structural details of the mechanism whereby the rods are moved forward or rotated or the size or form of the rods. Certainly they disclose nothing more in this respect than was disclosed by Clayton.

The plaintiff himself, throughout his testimony, makes it abundantly clear that his claim to invention runs only to the three features just above mentioned. For example, the following quotation from his testimony (Trans. pp. 83, 84):

"Q. You say all bleaching machines then that have that unison drive and are continuous machines embody your invention?

A. I say all bleaching and desulphurizing machines that are continuous in their operation and have rotable. rollers with drainage spaces between them and driven in unison are covered by my patent."

And again (Trans. p. 88), in referring to another machine, the operation of which had been described, the plaintiff says: "That is an infringement * * *.—the method of whether you run it, as you call it, with a galloping motion or not—whether you step it through or put it through on a chain conveyor, that is immaterial, since the bleaching or desulphuring of rayon is done continuously and automatically."

Statements of similar import occur at various other points in the testimony, and the contention of the plaintiff is made clear in his brief from which the following extracts are given: "The mechanical details of construction are not essential to the invention, and many of the constructional features are the same as in the Clayton machine, which formed the basis of applicant's design." (p. 6)

And (on page 51) it is said: "Thus there are two important distinctions between plaintiff's apparatus and that of the Clayton patent, first, automatic means for conveying the rods across the drainage spaces between the successive shower units; and, second, power means for operating all parts of the apparatus having to do with movement and rotation of the rods in unison. These two features characterize plaintiff's invention as an improvement over the Clayton patent and the machines made in conformity therewith in use at the Viscose Company's Roanoke plant when plaintiff was first employed there."

These references and quotations have been thought desirable to make clear the limits of the plaintiff's claim as involved in this suit. The plaintiff has in his testimony and in his brief defined the issues and, as the Court sees it, rests his case on the contention that he has a valid patent on the feature of conveying the rods automatically from one spraying unit to another and the feature of operating all units from a common power source. This obviates the necessity of discussing those portions of the evidence not relating to these questions.

The circumstances under which the plaintiff claims to have conceived his invention deserve mention. Just what technical education or experience the plaintiff had when he entered the employment of the Viscose Company is not developed in the evidence, but, by his own statement, he had had no previous experience in the rayon industry or in any textile industry and had no knowledge of bleaching machines. The evidence is that on November 21, 1925, two days after the plaintiff was employed, he was directed to make a drawing in connection with a brake for the hydro-extractor and that, in company with another draftsman, he went into the bleaching room to examine the hydro-extractor. While there he walked over to a bleaching machine in the same room, in connection with which the other draftsman was working, and displayed an interest in the purposes and operation of the machine which he had not previously seen. The plaintiff's own testimony as to his conception is as follows: "About a day or two after I had been there Mr. James A. Breakel, Chief Engineer of the Viscose Corporation, assigned me to change all hydro-extractors in the bleach room. While in there I noticed this conveying type of machine wherein skein carrying rods formed a part thereof. I noticed this intervening space between several machine units in which men were transferring these rods from one machine to the other and I conceived the idea of having that done automatically by extending the rails across and also by driving the several units off of one line shaft or in unison. That was about November 21, I believe."

The plaintiff further testifies that a few days later (November 25), while getting lunch in the company cafeteria, he met and became friendly with one Hodges, who was a painter employed by the company; and that he disclosed to Hodges the idea which he had conceived and illustrated it by a pencil sketch. That he indicated to Hodges his intention of applying for a patent and on the next day he and Hodges entered in a written agreement whereby the latter was to have a one-half interest in the invention for a consideration of $1,000. This agreement was introduced in evidence. The plaintiff did not at that time disclose his invention to anyone else. He says that about three weeks later, while in the bleaching room with Mr. Breakel, chief engineer of the plant, and Mr. LaBrie, machine shop foreman, he suggested to them that the rail members of the separate machines could be extended across the intervening spaces to eliminate the manual transfer of the rods and all the machines could be driven in unison. That to this, Mr. Breakel replied in substance: "I think that will be a good idea and we will possibly try to put through something to that effect." That thereafter, within the next five or six weeks, he talked with several minor employees of the company about his idea. He states that he made no sketches or drawings of his invention while he was employed by the Viscose Company and that he first did so several weeks after his employment ceased when he prepared drawings for his patent application. The plaintiff further states that the Viscose Company made use of his invention prior to his leaving and says, "If I am not mistaken they had four units completed out of the five that they had in operation at the Viscose Company when I left there"; but there is no evidence that he aided or was consulted in any way, as a draftsman or otherwise, in the installation of this improvement which he claims to have invented. (Note: In the quotation just above it is assumed that by use of the word "units", the witness does not refer to single Clayton machines but that he refers to units of the plant. Another witness has

described the plant as divided into units, each separately housed and each capable of turning the raw product into marketable form. Each "unit" has a full complement of machinery, including spinning machine, reeling machines, bleaching machine and hydro-extractors, and operates independently of the other units. This application of the word "unit" should be borne in mind because of future reference to No. 5 unit of the Viscose plant.)

After leaving the Viscose plant, the plaintiff appears to have gotten in touch, by correspondence and otherwise, with various concerns engaged in the rayon industry, informing them of his invention and attempting to interest them in the purchase or use of it or in financing the building of machines embodying it. Without discussing the course of these efforts, it is only necessary to say that none of these efforts were successful. Finally, in November, 1927, the plaintiff filed application for a patent which issued March 18, 1930. I gather also from the evidence that he has obtained patents in several foreign countries, although the dates thereof are not disclosed. After issuance of the patent, efforts were renewed to license the use of machines under it. These were likewise unsuccessful and no manufacturer has accepted a license under it and no machine has ever been built under its specifications by the plaintiff or anyone else.

On November 8, 1928, a man named Lewis P. Tenca, employed at the Cleveland plant of the Industrial Rayon Corporation, which is the defendant here, applied for a patent on a "Bleaching Machine" and on this a patent was issued November 12, 1929 (No. 1,735,146); all rights therein having been assigned by Tenca to the defendant. Tenca's patent was based on the Clayton machine and the patentable improvements claimed were in details of the mechanism whereby the rods were moved through the machine and were rotated in the course of their forward movement. Tenca made no claim based on automatic transfer of the rods from one spraying unit to the next nor on operation of all spraying units from a single power source, although these features were in use in the operation of the machines at defendant's plant. McElrath, learning that defendant was operating its bleaching machines in a manner conforming to the claims of his patent, gave notice of infringement. When Tenca thus learned that a patent had issued to McElrath covering the features of automatic transfer between spraying units and the unison operation of the units, he (Tenca) applied for a reissue on his patent asserting that his patent had disclosed these features and seeking to claim them. In filing application for reissue, Tenca asserted that it was done in order to instigate interference with the claims of the McElrath patent and have the question of priority of invention, as between Tenca and McElrath, determined. An interference was declared and, after hearings had, it was held by the Patent Office that, as between McElrath and Tenca, priority of invention was in the former; but it expressed doubt that either of them was the first inventor. This interference proceeding, of which much mention has been made in the case, will be discussed later in this opinion and its bearing on the case then considered. The decision of the Patent Office in the interference proceedings became final in March, 1934, and a little over a year later this suit was instituted.

This somewhat lengthy discussion of plaintiff's history of his invention and of the other circumstances mentioned has been thought necessary because of the nature of the defenses made to the suit.

### Defenses

The defendant has raised the issues of (1) non-infringement, (2) invalidity of the patent, and (3) non-joinder of parties plaintiff. The questions raised under Nos. (1) and (3) may be, for the time being at least, passed over, while we proceed to a discussion of No. (2), involving the validity of the McElrath patent. This is because it is the most emphasized defense, the one to which the larger part of the evidence pertains, and which seems determinative of the case.

Defendants claim that the patent in suit is invalid because (1) it is anticipated in the prior art, (2) that it contains no invention over the prior art but the mere application of mechanical skill to prior disclosures, and (3) there is a lack of originality, in that the invention was made by engineers of the Viscose Company and not by McElrath. They invoke the defenses of public use and knowledge prior to the invention and of public use more than two years before McElrath's application was filed, prior patent and prior invention. In application of the facts to these defenses, the defendants contend and have

sought to prove: that bleaching machines embodying the features claimed in the McElrath patent, namely, a junction of the spraying units with unison operation and automatic transfer of rods between spraying units, were in wide use in the rayon industry several years before McElrath claims the conception; that they were in use by various manufacturers of rayon and that prior to McElrath's employment the Viscose Company had been adjusting its various bleaching machines to operate in this manner; that this work was going on when McElrath came to work there and that the latter's alleged conception of the idea arose from what he saw taking place in the Viscose plant and learned from the records of that company; and that McElrath appropriated the idea and surreptitiously obtained a patent thereon.

The evidence introduced by defendants to show that McElrath was not the inventor of this machine is voluminous. It consists of the testimony of many executives and employees of the Viscose Company and other rayon producers; of sketches, drawings, factory orders, correspondence, etc., in such volume as that any analysis of the evidence is not possible within any reasonable compass. It may be said, however, that certain facts as to the prior use of machines embodying the McElrath patent are established beyond any question of controversy. The history of its use by the Viscose Company is, briefly stated, as follows:

It is stipulated that prior to 1923 Courtauld's Limited was engaged in manufacturing rayon in Great Britain at plants at Coventry, England, and Flint, Wales. That the process of bleaching the rayon was carried out by a machine consisting of a series of aligned, longitudinally spaced units constructed and operated in accordance with the Clayton patent, with a separate Clayton machine or unit, separately driven, used for each shower. The units were spaced apart to allow for drainage of the skeins and the rods were transferred from one unit to the next by manual means. (This was the exact practice used at the Viscose plant at Roanoke prior to 1925.) Early in 1923 a machine at the Flint, Wales, plant was changed to eliminate the separate motor drive for each unit and a belt drive from a line shaft was substituted. The drawings made by the engineers of Courtaulde showing this arrangement were completed about March 6, 1923, and the machine operated shortly thereafter in the same year. In the year 1924 there was completed for the Flint plant a machine embodying (to quote from the stipulation) "a method of continuous mechanical traveling of the rods from end to end of the usual five units of the bleaching machine so that the skein carrying rods were carried through the machine under the successive showers and through drip spaces between the showers automatically and continuously and without manual handling of the rods from the time they were put into the machine until they were taken out of the machine after the bleaching operation had been completed.

"This involved a change from the original type of bleaching machines in that each of the units made according to the Clayton patent was driven by means of a lay shaft running the length of the complete machine, driving the separate units in synchronism through worms and worm wheels. The change also involved the incorporation of bars between the units for conveying the skein-carrying rods from one unit to the succeeding unit and across the drip spaces between the units."

It will be seen from this stipulation that as early as 1924 there was in use in Great Britain a bleaching machine completely embodying the features claimed by McElrath as his invention. Drawings showing these machines and their method of installation and use were made by Courtaulds. In the Fall of 1924, Mr. F. H. Griffin, then technical manager for the Viscose Company of America (a subsidiary of Courtaulds), went to England and while there visited the various plants operated by Courtaulds. He saw the continuous and synchronously operated bleaching machine in use and discussed its operation with the officials of the Courtaulds plant. On his return to America in October, 1924, he brought information of this machine and discussed it with various persons in the Viscose organization.

In February, 1925, Mr. H. Johnson, general manager of the Viscose operations in America, cabled to England for description and drawings of the continuous bleaching machine in operation at the Courtaulds plant in Wales and the drawings were sent, together with a lengthy letter of explanation as to the manner of use of the machine. These were received in Marcus Hook early in March, 1925. In May, 1925, Mr. Henry Crewdson, theretofore at the Lewiston plant of the Vis-

cose Company, came to Marcus Hook in the capacity of Chief Engineer of the Company. The drawings and descriptive matter sent from England were shown to him shortly after his arrival at Marcus Hook and he proceeded immediately to adapt the continuous movement and synchronous drive to the machines at Marcus Hook. It appears that while at the Lewiston plant in 1924, Mr. Crewdson had devised a method of transferring the skein rods from one spray unit to the next by mechanical means referred to as a "finger transfer mechanism"; but had not used the synchronous drive at Lewiston. In adapting the machines at Marcus Hook to the plans sent from England, Mr. Crewdson thought his finger transfer mechanism preferable to that shown in the British design and he accordingly used it, but followed the British plans as to the continuous shaft for unison operation. By June, 1925, the necessary modifications had been made on one of the machines at Marcus Hook and found to work so successfully that it was at once decided to install the unison drive and automatic transfer on all the machines at the plant, of which there were then four in number; that is, four machines each consisting of a group of five Clayton unit machines. This work could not all be done at once because of the impossibility of suspending all bleaching operations. But in June, 1925, the No. 3 machine was taken out of commission for the installation of the continuous drive and finger transfer mechanism.

On the 2nd day of June, 1925, Mr. James A. Breakell, chief engineer at the Roanoke plant of Viscose, visited Marcus Hook in the course of his duties. While there Mr. Crewdson showed him the operation of the mechanism for transferring the rods and suggested its installation at the Roanoke plant. He also told him of the British machine. Mr. Breakell made a small sketch of the transfer mechanism as it was operated at Marcus Hook and took it with him to Roanoke. Several weeks later, after the Marcus Hook plant had demonstrated the success of the unison drive, Crewdson took up with Breakell the matter of installing this feature on the machines at Roanoke. In August, 1925, Crewdson sent to Roanoke a drawing illustrating the continuous drive and a letter descriptive of its installation. Immediately on his return from Marcus Hook, Mr. Breakell had discussed with his draftsman (Mr. Franks), his machine shop foreman and others, the automatic transfer mechanism which he had seen there and within a week they had started fabricating these mechanisms for the Roanoke machines, doing the work in the plant machine shop out of materials found around the factory.

All of the above took place some five months before McElrath entered the employment of the Viscose Company and the succession of events set out is clearly established. Following receipt of the drawing and instructions for the continuous drive machine, some work was also done on this in the way of assembling materials, and it is testified that during this time the matter of both the automatic transfer and the synchronous drive were matters of discussion and talk among the officers and employees of the plant. It is testified to by a number of witnesses that by late summer or early fall (there being no record of the exact date) the No. 1 bleaching machine had been equipped with the automatic transfer mechanism and that, when McElrath came to work in November, similar mechanism was being installed on the other machines. That some work was being done toward equipping the machines with the continuous drives although the placing of these on the machines did not begin until in December, 1925, and operation with the continuous drive began about a month later. Work on both features was carried on mostly over weekends because the business required that the bleaching machines be kept operating as much of the time as possible. In any event, the evidence is overwhelming that during the summer and fall of 1925 work was going on to equip the machines with both automatic transfer and synchronous drive; that drawings and instructions were on hand for this purpose; that, by November 19th, when McElrath came to the plant, the work had well progressed and in part been completed. It is also clear that this work was within the knowledge and was the subject of discussion of many persons about the plant; and that its nature and progress was open to the view of anyone who entered the bleaching room. Also—although this is denied by McElrath—that the drawings and other data relating to the new mechanism were open to the observation of McElrath, as well as others, and were, together with the progress of the work, dis-

cussed in his presence. Mr. Breakell, Chief Engineer, testifying to the progress of the work during the summer and fall and its status when McElrath entered the employ of the company, testifies that no part of it was due in any way to any suggestion or idea advanced by McElrath; and the testimony of other witnesses, as well as the surrounding and uncontradicted facts, strongly supports this statement.

Another important feature of the evidence, as bearing on the alleged conception by McElrath, is this: In 1925 the Roanoke plant was expanding its production capacity and had begun the construction of a new unit. This unit required along with other machinery a complete bleaching machine. After the receipt from England, in March, 1925, of the plans for a continuous machine, heretofore referred to, it was decided that the new unit should be equipped with a new bleaching machine constructed entirely on the English design. On July 27, 1925, Mr. Crewdson, Chief Engineer for Viscose in America, wrote to England saying that he would soon be placing an order for a complete bleaching machine for the No. 5 unit at Roanoke to be built in accordance with the drawings previously sent from England, but before placing the order he would like to know if any changes in the plans of the machine had been made since the drawings were sent to America. In reply he was informed that no changes had been made and he was safe in going ahead with the order. Accordingly early in October, 1925, an order was given to William Pedlow, machine manufacturer, of Chester, Pa., for a complete bleaching machine of five spray units constructed on the English plans with automatic transfer and continuous drive. The construction of this machine of course took some time, and it was shipped to Roanoke in two separate car loads, February 5th and February 24th, 1926. In the meantime the building for housing this new No. 5 unit was being constructed at Roanoke before and during the time of McElrath's employment. The unquestioned facts as to this machine constitute proof that plans for a complete continuous machine were in possession of the Viscose Company and that such a machine had actually been ordered and was being fabricated before McElrath's employment. But they are also important from another standpoint. This is the type of machine of which McElrath claims to be the inventor.

He testifies that he made no drawing of the machine until after he left the Viscose Company, but that he disclosed his invention to Mr. Breakell early in December, 1925 (about three weeks after his employment began). Even if we were to throw aside the conclusive and uncontroverted evidence that the machine was ordered in October, it would be pertinent to inquire whether Mr. Breakell could, as the result of a mere suggestion made in early December, have prepared drawings, given the order, and procured the machine ready for installation by February.

It is McElrath's contention that the development of continuous drive, automatic transfer machines at Roanoke was as a result of his conception after he entered employment there, and this rests merely on his own statement, with no evidence whatever to support it. The evidence, only a small part of which has been referred to, is overwhelmingly and conclusively to the contrary and shows that these machines were put in use as the result of plans formulated by the company months before and which were being carried into application before McElrath ever entered its employment.

### Prior Use by Other Manufacturers

In addition to the evidence as to the development of the continuous bleaching machine by the Viscose Company, both at Marcus Hook and at Roanoke, heretofore discussed, the defendant has introduced a mass of evidence to show the use of similar type machines by other manufacturers prior to 1925. This need not be discussed in detail. It is sufficient to say that it clearly establishes such use. In 1922 the Dupont Rayon Company (then known as Dupont Fibersilk Company) designed and had drawings made of a machine through which the rayon skeins were transferred mechanically through the successive showers with drainage spaces between, with the entire machine driven from one source of power. This machine was first put in operation at this company's Buffalo plant in February, 1923, and was followed by four other machines of the same type. They were used in successful operation until the plant was dismantled in 1931 or 1932. This same company, in 1924, constructed a rayon plant at Old Hickory. Tenn., and began operations there in the spring of 1925 with bleaching machines similar to those used at Buffalo which, at

the time of this trial, were still in use. The Dupont Rayon Company also installed similar machines in its Richmond, Virginia, plant in 1927 or 1928 and these are still operating.

The Acme Artificial Silk Company (now known as Acme Rayon Corporation) of Cleveland began the manufacture of rayon late in 1921 or early in 1922. From the beginning this company used a bleaching machine which an executive of the company describes, in part, as "one where the yarn was hung upon rods and then the rods were fed on one end of the machine, with the conveyor on each side, an endless chain, and the rods set into links of that chain and were carried successively to the various showers throughout the length of the machine, having between each shower a draining period". The machine was driven by a continuous line shaft and the several successive spraying solutions came from above with tanks underneath to catch the dripping solution. The skein rods were rotated in the course of their forward movement. The drawings showing the design of this machine, made in March, 1921, were exhibited. This machine was used continuously and successfully in commercial production until 1926 or 1927, when it was replaced by a larger machine of greater capacity but operated on the same principle.

It is further proven that the Manville-Jenckes Company of Rhode Island, which entered the rayon business in 1924 and built a plant during that year, used a continuous automatic bleaching machine from the beginning of operations early in 1925. This concern, a cotton textile manufacturer, decided to embark in the then new rayon industry and on January 1, 1924, entered into a contract with John Brandwood of England for the construction by the latter of a complete plant for the manufacture of rayon, including certain machinery and apparatus manufactured in England. The plant was built, machinery installed, and operations began early in 1925 at Woonsocket, Rhode Island. The bleaching machine furnished by Brandwood was one of his own design on which he later (September 21, 1925) applied for a United States Patent, which was granted (February 9, 1926). This Brandwood machine was similar in general features to the Clayton machine, that is, the moving of the skein-bearing rods

along parallel rails while subjecting them to chemical sprays and revolving the rods in the course of their forward movement. What Brandwood claimed (when he applied for his patent) was an improvement and simplification in the mechanical means whereby the rods were moved and rotated. When Brandwood installed the machine at Woonsocket, he built it as a continuous machine in which the skein-bearing rods passed mechanically through all of the successive sprays. In order to separate the chemical sprays and to give opportunity for drainage, he adopted the simple method of leaving out several spray pipes at intervals so that the skeins could drain while moving through this space and before entering the next spray. It may be here pointed out that the Brandwood patent (No. 1,572,627) is cited as an anticipation of McElrath and it is noticeable that the use of the Brandwood machine as installed at Woonsocket was a use contemplated by Brandwood and mentioned by him when he applied for his patent some months later. While the claims of the Brandwood patent run only to the mechanical means of moving and rotating the rods, he says in his patent (page 8):

"The apparatus as a whole may be many feet long with the spray pipes, 14, seen in Figure 1, divided into groups delivering different fluids and with the drain trays, 72, under them discharging their contents to different tanks each according to its kind.

"This, however, is no feature of the invention, being a device already used in practice."

The machine installed by Brandwood for Manville-Jenckes was operated by them until about 1927 or 1928, at which time, a machine of larger capacity being desired, it was sold to Amoskeag Manufacturing Company of Manchester, New Hampshire, and placed in use by the latter concern.

To sum up the effect of this evidence, it is proven, and the Court finds the facts to be, that bleaching machines embodying the features of a continuous drive and automatic mechanical transfer of the skein bearing rods through the several sprays necessary for the entire bleaching process were known in the United States at least as early as 1921 and were in commercial use in this country by the Acme Rayon Corporation at Cleveland in 1922; at the plant of the Dupont Rayon Company at Buffalo in February, 1923; at the Man-

208

ville-Jenckes Company in the early part of the year 1925. And that the use of such machines has been continuous since.

■ When it is noted that the manufacture of rayon in the United States did not begin until about 1921, it will be seen that practically from the inception of the industry the use of continuous bleaching machines was in practice. In argument the plaintiff does not seriously undertake to deny the evidence as to the prior use of these continuous bleaching machines; as, in fact, he could not do in the face of the evidence. But the contentions are made that the knowledge and use of these machines was not such as under the terms of the statute (R.S. 4886; 35 U.S.C.A. § 31) constituted an anticipation which renders McElrath's patent invalid. This position revolves around the contentions (1) that the prior use machines were experimental or incomplete and not of practical and successful commercial use, and (2) that the knowledge and use of these machines was not a public use. This latter contention has its basis in the principle that the knowledge and use of an invention or device necessary to invalidate a subsequent patent must be in such manner as to be accessible to the public. Gayler v. Wilder, 10 How. 477, 13 L.Ed. 504. It is specifically urged that the use of all the various machines shown to have been operated prior to McElrath's conception was a secret use by the respective operators, knowledge of which was not public. And it is argued that, in the absence of public knowledge of use, if McElrath made the invention by the efforts of his own genius and believed himself to be the original inventor, his patent is valid. Gayler v. Wilder, supra.

Conceding the correctness of the principle of law advanced, the facts do not permit its application. As to the practicability and success of the prior use machines, I think it necessary only to say that the evidence is that all of the machines as to which evidence was taken operated with marked success in the regular course of the business over years of service and that many millions of pounds of rayon were successfully treated on them; that some of them were still in operation at the time of the trial and probably still are. The only suggestion to the contrary is that the Brandwood machine operated by Manville-Jenckes, after being sold to Amoskeag, was redesigned in some structural details which the latter concern thought would improve the results obtained from it. There is no merit in the contention that the prior use machines were experimental or lacking in commercial utility.

As to the argument that there was no public knowledge of the use of the machines operated by Acme, Dupont and others, this seems to be based on the fact that in the early days of the rayon industry, the persons engaged in it adopted a certain amount of secrecy as to their manufacturing processes. The industry was then new and was and is based on the application of complicated chemical treatment to certain raw materials, the nature of these processes varying with the nature of the basic material used. No doubt that some precautions were taken against dissemination to the public and to competitors of knowledge of the processes by which the respective manufacturers produced their rayon. Generally speaking, the unidentified members of the public were not offered free opportunity for inspection of all parts of rayon plants nor was publication made of the detailed processes of manufacture. But the evidence does not disclose that any particular secrecy surrounded the bleaching process. On the contrary, it shows that this was not the case. In each of the plants named, the operation of the bleaching machines was not only within the view and knowledge of all factory employees, but was frequently exhibited to executives of other rayon plants on visits exchanged and also to groups of lay visitors who were shown through the plants from time to time. There was no reason for secrecy about the bleaching machines. All of these plants followed well known and accepted methods for the bleaching of yarn and the very fact that all of them used machines operating on the same principle and in the same manner is indicative of the lack of any purpose or need for secrecy.

■ It is obvious that in determining whether there has been public use and knowledge of an invention there must be considered the nature of the invention and the field in which its use is normally practiced. No doubt the great majority of the persons going to make up the general public never heard of or saw a continuous bleaching machine, either prior to McElrath's patent or since, and they probably never will. Probably McElrath himself, having no experience in or knowledge

of the industry, never heard of one or saw one used until he went to work at the Viscose plant. But if the machine was in use within the restricted field to which its use was applicable and was known to the persons engaged in that field of work, this would nevertheless constitute public use and knowledge within the meaning of the law.

*The Interference Proceedings with Tenca*

The interference proceeding between plaintiff's patent and that of Tenca has been heretofore briefly referred to, but because of the emphasis placed upon its asserted effect, further discussion of it is necessary. The history of the Tenca patent, as disclosed in the interference proceedings (the record of which is exhibited here), is about as follows: In 1925 a Mr. F. C. Niederhauser was employed at the Roanoke Viscose plant as Assistant Manager. This was during the time that the continuous drive machines were being installed there. Early in 1926 Mr. Niederhauser left the Viscose Company and went with defendant, Industrial Rayon Company, as Manager of Production and Vice-President. One of his first duties at defendant's plant was to design and erect a mechanical bleaching machine to replace the semi-mechanical method then in use. Mr. Niederhauser suggested an adaptation of the continuous machine which he had seen installed at Roanoke. Tenca, a machine designer employed by defendant was put to work on the machine. In an effort to avoid any infringement of the Clayton patent, Tenca designed a different mechanical means to accomplish the forward movement of the rods and their rotation, and possibly other structural details. At the time Tenca designed his machine, he had before him plans of the Viscose machine and his design was for a continuous machine as used at Viscose but with the change of structural details referred to. Tenca then applied for a patent on his machine, claiming as his invention, however, only the structural changes made by him. He did not claim the features of mechanical transfer or continuous drive, because, as stated by officers of the defendant (to which the patent was assigned and which prosecuted the application), they did not consider those features as patentable, being merely combinations of well-known mechanisms and the use of which was within the previous knowledge of Niederhauser. Tenca obtained his patent November 12, 1929. In 1931 he found out that McElrath had obtained a patent (issued subsequent to Tenca) on the continuous drive machine. Tenca was, therefore, faced with the situation of seeing a patent issued to McElrath on features which he (Tenca) had utilized in his machine a year or more before McElrath's application, but which Tenca had refrained from claiming, and which he was now charged with infringing. He apparently thought that if the Patent Office considered these features patentable, he (Tenca) was entitled to the patent instead of McElrath. He, therefore, filed application for a reissue claiming the continuous machine as his invention and asked for determination of priority as between him and McElrath. On the hearing of this Tenca testified to his design of the machine at defendant's plant early in 1926. McElrath, as he does now, claimed his invention to date from November, 1925, when he went to work for Viscose. On this evidence, the Patent Office adjudged priority as between the two to be in McElrath, but expressed doubt that either of them was the real inventor. The opinion of the Examiner of Interference says, in part: "From the evidence it is found that there is a possibility that automatic bleaching machines were installed at Viscose Company plants other than the Roanoke plant in 1923 and 1925, but whether they would support the issue is not found in the evidence. A complete drawing of the machine supporting all the counts was in possession of the Viscose Company as of March, 1925, and knowledge of this drawing was conveyed to the Roanoke plant by October 3, 1925. It is well settled law, however, that invention cannot be set up in a third party to defeat a party to the interference. The interference relates solely to the question of priority as between McElrath and Tenca, and invention by a third party is immaterial. Foster v. Anisdel, 88 Off.Gaz. 1527 [14 App.D.C. 552]."

At the time McElrath's patent issued, there was before the Patent Office no evidence of the Viscose machines or the prior use by Acme, Dupont and others and it learned of the Viscose machines only when the interference was heard. Even though it had then concluded that it had issued a patent to someone not entitled to it, its power was limited to determining the issue immediately before it, i.

e., priority as between the parties to the interference. It had no power to cancel the patent to McElrath, no matter how improvidently granted. McCormick Machine Co. v. Aultman, 169 U.S. 606, at page 608, 18 S.Ct. 443, 42 L.Ed. 875 and cases there cited.

While his position is not entirely clear, the plaintiff apparently seeks to give the result of the interference proceeding the effect of establishing as a fact that McElrath was the first inventor and that, as to the defendant at least, his patent cannot be attacked as invalid. It is also urged that the assertion of identity of subject matter on which the interference was based precludes any defense of non-infringement. The Court refrains from a discussion of the question of infringement, or of estoppel against such a defense, for the reason that it appears not material to the result of the case.

But it is well settled that the result of the interference does not estop the defendant from claiming that the McElrath patent is invalid even though the defendant (through Tenca) once applied for a patent on the same features and in doing so asserted their patentability. Haughey v. Lee, 151 U.S. 282, 14 S.Ct. 331, 38 L.Ed. 162; Paramount Corp. v. Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L. Ed. 997. In Haughey v. Lee, supra, it is said [151 U.S. 282, 14 S.Ct. 332, 38 L.Ed. 162]: "There is no merit in the proposition made in the second assignment of error, that defendants are estopped from asserting that there is no patentable novelty in plaintiff's invention by their conduct in seeking to procure, through one of their employes, a patent for substantially the same invention. Whether or not there is any inconsistency in trying at one time to get a patent for a supposed invention, and in afterwards alleging, as against a rival successful in obtaining a patent, that there is no novelty in the invention, it certainly cannot be said to constitute an estoppel. Besides, the defense of want of patentable invention in a patent operates, not merely to exonerate the defendant, but to relieve the public from an asserted monopoly, and the court cannot be prevented from so declaring by the fact that the defendant had ineffectually sought to secure the monopoly for himself."

See also Computing Scale Co. v. Standard Computing Scale Co., 6 Cir., 195 F. 508; and Imperial Brass Co. v. Hackney, 7 Cir., 75 F.2d 689. In Automatic Racking Co. v. White Racker Co., C.C., 145 F. 643, the rule is stated (Syllabus): "The defeated party in an interference proceeding in the patent office, which involved only the issue of priority of invention, is not estopped by the decision to contest the validity of the patent granted to the successful party, when sued for its infringement, on the ground of lack of patentable novelty or invention."

### The Defense that the McElrath Patent Involves No Invention

In addition to the defense of anticipation by the prior art, the defendant asserts that the patent in suit is invalid as involving no invention but merely the application of mechanical skill. I think this contention is also well founded, and consideration of the case from this aspect furnishes the explanation of why, although the prior use was extensive, no previous application had been made for a patent embodying the features claimed by McElrath. It appears not only from an examination of what McElrath claims to have invented but also from the testimony that the prior users saw no invention involved in the use of a continuous bleaching machine. The officers and engineers of the Dupont Company refer to their machines as being constructed and operated on the conveyor principle with which they had been familiar in automobile factories, ammunition plants, etc., meaning the frequently used method whereby any article requiring a succession of treatments is passed by mechanical means through the successive stages of treatment. Officials of the Acme Company likewise refer to their machines as constructed on the conveyor principle. When Brandwood applied for his patent (the machine used by Manville-Jenckes), he pointed out the use of his machine for moving yarn through a succession of chemical sprays by dividing the spray pipes into separated groups, saying, however, that there was no novelty in this arrangement and that it was "already used in practice". Even Clayton, whose patent, issued in 1914, has been heretofore discussed, evidently considered that the use of a number of his unit machines as a continuous machine was an obvious thing for, in describing his machine he says: "In the process of bleaching, the hanks of thread are generally carried through five apparatus (either used sep-

arately or *coupled together*) of a plant in the following order, namely, a sulfiding apparatus * * *, etc. (Italics by the Court). And it will be remembered that Tenca, in making his original application on the machine used by defendant, considered that his invention ran only to details of mechanism and that the feature of a continuous machine was not patentable, being merely the *application of well-known principles.*

■ It is apparent that all of these people, designers and inventors of bleaching machines, as well as persons experienced in their use, considered that there was no patentable novelty in joining up a number of unit machines to operate in unison and continuously for the entire bleaching process; that this required no more than the application of mechanical skill. And the fact that so many different rayon manufacturers, Acme, Dupont, Manville-Jenckes, Viscose, all acting independently, adopted this method of operation, indicates that the practice was an obvious one. There can be little doubt, I think, that any of these people would have hastened to obtain the monopoly created by a patent on a continuous bleaching machine had they considered it patentable. And while it is for the Court to determine whether any patentable novelty was involved, the fact that persons experienced both in the design and use of such machines considered it merely the application of ordinary mechanical skill has weight with the Court in reaching its conclusion. It is in effect expert opinion on the subject.

But even if there were no evidence of the opinion of these persons, I would have no difficulty in arriving at the view that no invention was involved in the features claimed by McElrath. Machines of the Clayton type (and probably others) used for dyeing or bleaching yarn by means of showers or sprays of an applicable liquid through which the yarn is moved on rods have been in use in the textile industry for years. If it became necessary to complete the bleaching process that a succession of different showers be used, it was certainly the obvious thing to arrange a succession of machines so that the material treated could move mechanically through the entire process; and it was an obvious dictate of economy and efficiency to have the unified machine operated as a whole from one source of power. This is all that McElrath did. The plaintiff emphasizes that his machine involves a patentable improvement particularly because of the provision for drainage spaces between the spray units. To my mind there is even less of the element of invention involved in this than in any feature claimed. If the yarn was to be subjected to successive treatments of different chemical solutions, it certainly did not require inventive genius to suggest that the showers be spaced sufficiently apart to permit drainage of one solution before entering the next.

■ According to a patent the full measure of the presumption of validity which its issuance carries, it is nevertheless clear that this patent does not involve invention, but merely the application of mechanical skill. It is not invention to produce a machine or process which any skillful mechanic or other expert would produce whenever required to effectuate a given result. Walker on Patents, 6th Ed., Sect. 62. As said by Mr. Justice Bradley in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438: "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. * * * It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art."

And it may be said that this case of Atlantic Works v. Brady is most interesting in the similarity of the issues there presented to those in the instant case. The court there held that not only had the alleged invention of Brady been known and used by other persons long prior to his alleged conception, but that it involved no invention and would readily have occurred to any skilled engineer. But the court went further and held that, even

if it were able to reach different conclusions on the questions mentioned, it was clear that Brady was not the inventor and was appropriating the ideas of others; that he never conceived the idea of his alleged invention until it had been communicated and explained to him by others with whom he was working.

This question is likewise raised by the defenses in the instant case and should not be ignored. Frankly, it is difficult to understand how the plaintiff ever convinced himself, if he did so, that he originated the idea of a continuous bleaching machine. It is possible, of course, that a person may conceive an idea that is novel to himself, although, unknown to him, it has been previously well known to others. The fact that the plaintiff, when he went to work for Viscose, had never seen a bleaching machine and had no knowledge whatever of rayon manufacture or its practice, would explain his lack of knowledge of the prior use of continuous machines in the industry. But even so, it is difficult to believe that, completely ignorant of the use of bleaching machines as he was, he could, within a few minutes after seeing such a machine for the first time, have conceived his alleged invention, as he now claims. And there is a certain vagueness and unreality about the plaintiff's testimony—an unwillingness to be definite about occurrences—as well as contradictions of testimony and conduct; all of which inevitably raise question of the sincerity of his claims. For example, there is no explanation of the delay of approximately two years between the time of his alleged conception and his application for a patent. It is true also that prior to the interference proceeding and while trying to interest manufacturers in his patent, he represented that he had made his invention after leaving the Viscose Company. When the interference arose, he had to go back as far as possible to establish priority and he then claimed invention immediately after entering Viscose employment, as he now does. But these and other contradictions that might be pointed out require little consideration when compared with the fact that when McElrath went to work for Viscose the construction of these continuous machines was well under way and they were the subject of discussion among officers and workmen at the plant. There seems no doubt that they were discussed before him, and we may presume that he participated in the talk and discussion to the extent that his work as a draftsman called for.

The most tolerant explanation of McElrath's claim to be an inventor is to be found in consideration of his character and temperament. He is plainly given to self-aggrandizement and to picturing himself as the important and moving actor in any scene with which he has any connection. For example, although his only experience in the rayon industry was his short service as a draftsman with Viscose, thereafter in writing to other manufacturers in an effort to interest them in his machine, he used stationery describing himself as a "consulting and research engineer" whose services were available for "Investigations, reports and designs; Rayon plants, location and supervision; Public service systems", etc. He wrote the Dupont Company that his machine had been developed as the result of his "practical rayon experience as a research engineer in one of the largest organizations in the world, and developed after severing relations with such organization". There is no evidence that the plaintiff is a graduate in any branch of engineering or other science and no evidence of experience as an engineer.

It is possible that a man of this temperament, seeing the installation of the machine at the Viscose and participating in the discussions about its details, convinced himself that it was his concept. The only other explanation is that, in his ignorance of the rayon industry and of the use of bleaching machines, McElrath thought that in the construction of the continuous machine at Roanoke he was witnessing something new and revolutionary; that later investigations by him disclosed no patent on such a machine and he then decided to appropriate the idea himself. The Court cannot say what motives or process of reasoning caused the plaintiff to claim to be the inventor of this machine. It can only be said that no matter what they were, the evidence is convincing that the idea was not original with him but that he derived it from what he saw being done at the Viscose plant when he went there.

The discussion of the facts in this case has extended to a length for which the Court feels impelled to apologize. But the case is unusual and the defenses of anticipation through prior knowledge and use and

213

of lack of invention raise issues which are essentially issues of fact. The evidence on all phases of the case has been most extensive and the Court has felt that both litigants were entitled to a full discussion of the facts on which its conclusions are based.

### Conclusion

In conclusion, it is found and determined that the McElrath patent in suit (No. 1,751,165), as to the claims thereof alleged to be infringed by defendants, is invalid, for the reasons:

(1) It was anticipated by the prior art, in that machines embodying the features thereof were publicly known and used in the United States several years prior to McElrath's alleged invention and certainly for more than two years prior to his application for a patent; that such prior use was a successful use in the regular course of business by various manufacturers of rayon.

(2) That the improvement allegedly conceived by the plaintiff and on which he obtained a patent involved no invention but merely the exercise of ordinary mechanical skill and was of such nature as that not only its usefulness but the means of its mechanical application was within the knowledge of those experienced in the industry.

(3) That the alleged invention was not original with the plaintiff, in that he did not conceive the ideas claimed by him but derived them from others.

The bill of complaint will be dismissed with costs in favor of the defendant.